# United States Court of Appeals
## For the First Circuit

---

No. 14-1651

NINA SHERVIN, M.D.,

Plaintiff, Appellant,

v.

PARTNERS HEALTHCARE SYSTEM, INC., ET AL.,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

---

Before

Kayatta, Selya and Dyk,*
Circuit Judges.

---

Ellen Jane Zucker, with whom Burns & Levinson LLP was on brief, for appellant.
Nancy Gertner, Emma Quinn-Judge, Zalkind Duncan & Bernstein LLP, Nina Joan Kimball, Kimball Brousseau LLP, Michaela May, and Law Office of Michaela C. May on brief for American Civil Liberties Union of Massachusetts, Charles Hamilton Houston Institute for Race and Justice, Massachusetts Employment Lawyers Association, Massachusetts Law Reform Institute, Jewish Alliance for Law and

---

\* Of the Federal Circuit, sitting by designation.

Social Action, Union of Minority Neighborhoods, and Gay & Lesbian Advocates & Defenders, amici curiae.

Thomas A. Reed, with whom Herbert L. Holtz, Eugene J. Sullivan III, and Holtz & Reed, LLP were on brief, for appellees Partners Healthcare System, Inc. and Massachusetts General Hospital Physicians Organization.

John Patrick Coakley, with whom Stephen D. Coppolo and Murphy & Riley, P.C. were on brief, for appellee Harvard Medical School.

Robert E. Burgess, with whom Edward F. Mahoney and Martin, Magnuson, McCarthy & Kenney were on brief, for appellee Harry E. Rubash, M.D.

Rebecca J. Wilson, with whom Kiley M. Belliveau and Peabody & Arnold LLP were on brief, for appellee James H. Herndon, M.D.

_____

October 9, 2015

_____

**SELYA**, <u>Circuit Judge</u>. Plaintiff-appellant Nina Shervin, M.D., secured admission to one of the country's most prestigious orthopedic residency programs. When she was placed on academic probation, she concluded that her superiors were discriminating against her based on her gender and thereafter began retaliating against her because she had dared to challenge the probation decision. Bent on vindicating these suspicions, Dr. Shervin repaired to the federal district court and sued a gallimaufry of defendants, asserting claims under both state and federal law.

The district court whittled down Dr. Shervin's suit during pretrial proceedings, and a 26-day jury trial ensued. The jury returned an across-the-board verdict for the defendants. Dr. Shervin appeals, asseverating that the district court miscalibrated the statute of limitations, improperly denied recusal, made several untoward evidentiary rulings, and committed instructional errors. After careful consideration of her asseverational array, we find no reversible error and, therefore, affirm the judgment below.

## I. BACKGROUND

We sketch the genesis and travel of the case, reserving a more exegetic discussion of the facts until our appraisal of the issues raised on appeal.

In 2003, Dr. Shervin began her post-graduate training in the Harvard Combined Orthopedics Residency Program (HCORP or the program). The program is sponsored by Massachusetts General Hospital (MGH), and training takes place at four Harvard-affiliated teaching hospitals: MGH, Brigham and Women's Hospital (the Brigham), Children's Hospital, and Beth Israel Deaconess Medical Center (BIDMC). MGH and the Brigham are both under the corporate umbrella of Partners HealthCare System, Inc. (Partners). During her five-year residency, Dr. Shervin was nominally an employee of Partners and worked under an employment contract with that entity.

HCORP is governed by an executive committee comprised of its director and the chiefs of the orthopedics departments at the four participating hospitals. During the times relevant hereto, Dr. James H. Herndon served as the program's director and Dr. Harry E. Rubash served as the chief of orthopedics at MGH. Both of these physicians were employed at MGH through a private, non-profit corporation, Massachusetts General Hospital Physicians Organization (MGPO), and held faculty appointments at Harvard Medical School (Harvard).

Mid-way through the fourth year of her residency, Dr. Herndon placed Dr. Shervin on academic probation — a decision Dr. Shervin soon came to regard as motivated by gender bias. She

asserts that, after she challenged the decision internally, she was subjected to further discrimination and an onslaught of retaliation that plagued her throughout her training and followed her as she pursued job opportunities throughout Massachusetts.

On October 26, 2009, Dr. Shervin filed a charge of discrimination with the Massachusetts Commission Against Discrimination (MCAD) against Partners, Harvard, Dr. Herndon, and Dr. Rubash. The MCAD later dismissed the charge without prejudice upon receiving Dr. Shervin's notification that she had elected to pursue her claims in court. See Mass. Gen. Laws ch. 151B, § 9. In April of 2010, she sued in the federal district court, asserting state-law claims of unlawful discrimination and retaliation against Partners, MGPO, Harvard, Dr. Herndon, and Dr. Rubash; federal-law claims of discrimination and retaliation against Partners, MGPO, and Harvard; and common-law claims of tortious interference with advantageous business relations against Partners and Drs. Herndon and Rubash.

After extensive discovery, the defendants moved for summary judgment on all of the claims, arguing that many were time-barred and that the remainder were foreclosed on other grounds. The district court granted partial summary judgment with respect to the discrimination and retaliation claims, ruling that (for all defendants except Harvard) conduct occurring prior to June 5, 2008

- 5 -

could not serve as a basis for liability or damages.  See Shervin v. Partners Healthcare Sys., Inc., 2 F. Supp. 3d 50, 72 (D. Mass. 2014).  The court fixed this date based on the applicable 300-day statute of limitations under federal and state discrimination laws, see 42 U.S.C. § 2000e-5(e)(1); Mass. Gen. Laws ch. 151B, § 5, and a tolling agreement establishing a constructive filing date for Dr. Shervin's suit of April 1, 2009.  Harvard was not bound by the tolling agreement, and the district court fixed its limitations date at December 30, 2008.  See Shervin, 2 F. Supp. 3d at 72.  The court was quick to add, however, that "while the [d]efendants may not be found liable for conduct outside the limitations period," the "jury may still be permitted to consider untimely 'background evidence' in assessing the viability of the actionable discrimination and retaliation claims." Id. at 71 n.10. The court denied the summary judgment motions in all other respects.  See id. at 80.

After a lengthy trial, the jury returned a take-nothing verdict.  This timely appeal followed.

In this court, Dr. Shervin musters a plethora of claims of error.  We consider them in roughly the same order as the underlying events occurred below.

## II.  THE SUMMARY JUDGMENT RULING

Dr. Shervin's flagship claim is that the district court erred in its application of Massachusetts law, leading it to conclude that certain alleged acts of discrimination and retaliation were time-barred.  We preface our discussion of this issue with a brief account of the pertinent facts, taking them in the light most favorable to the non-moving party (here, Dr. Shervin).  See Noviello v. City of Bos., 398 F.3d 76, 84 (1st Cir. 2005).

### A.

Dr. Shervin initially did well in her residency and received positive evaluations from her supervisors.  In early 2007, however, Dr. Herndon received a complaint from an orthopedics fellow about Dr. Shervin's recent performance in the program.  The fellow raised specific patient care issues and expressed concerns regarding Dr. Shervin's professionalism and technical competence.  On February 2, 2007, Dr. Herndon met with Dr. Shervin and communicated these concerns to her.  At the end of the meeting, he placed her on academic probation, telling her that probation could

have a serious effect on her licensure, her upcoming fellowship,[1] and her ability to find a job.

A follow-up letter, dated March 7, outlined the terms of the probation, including monthly performance evaluations; increased monitoring; mandatory attendance at all educational components of the program; and a ban on moonlighting. The letter warned that if Dr. Shervin's performance continued to deteriorate, she could be exposed to further discipline, including dismissal from the program.

Around the same time, Dr. Herndon told Dr. Shervin's mentor, Dr. Dennis Burke, that the reason he (Dr. Herndon) had gone directly to probation without first issuing a warning or undertaking counseling was due to Dr. Shervin's stoic response to his concerns; he added that, in his 35 years of supervising residents, he had never before disciplined a woman resident and not seen her cry. Based largely on this comment, and on her perception that immediate probation was not standard practice in HCORP, Dr. Shervin concluded that Dr. Herndon's rush to judgment had been motivated by gender bias (specifically, his

---

[1] In 2006, Dr. Shervin accepted a one-year arthroplasty fellowship at MGH, to commence shortly after the anticipated completion of her residency in June of 2008.

"stereotypical attitude" toward women and her failure to "behave in the way that Dr. Herndon expected [her] to behave").

Dr. Shervin voiced her concerns to Dr. Rubash in March of 2007. According to Dr. Shervin, Dr. Rubash expressed surprise at Dr. Herndon's decision to impose academic probation without consulting HCORP's executive committee. But he then asked rhetorically if she wanted to graduate from the program and admonished her not to think of "ever filing" suit against him, Dr. Herndon, or the program because doing so would not be beneficial to her career.

In Dr. Shervin's view, this incident marked the beginning of a steady stream of retaliatory and discriminatory acts that clouded the remainder of her residency. These acts included the zealous solicitation of negative comments about her by Drs. Herndon and Rubash.

In late March of 2007, Dr. Shervin requested a review of the probation decision by the executive committee. The committee upheld the decision in early June. Dr. Shervin contends that the review process was incomplete, biased, and lacking in basic procedural safeguards. She also alleges that, shortly after this review concluded, a member of the executive committee (Dr. Mark Gebhardt) told Dr. Burke that Dr. Shervin "needs to get her head

screwed on and realize that she is a woman in a man's specialty" and "suck it up."

In late June of 2007, Dr. Herndon and the executive committee extended Dr. Shervin's probation for three more months based on allegations of poor performance on a rotation at another hospital.  Dr. Shervin says that these allegations were unsubstantiated.  She adds that, throughout the summer of 2007, the defendants repeatedly tried to find fault with her performance and solicited negative evaluations of her work.  By September, she felt "threatened[,] unsafe[, and] harassed."

About the time that Dr. Shervin's extended probation ended in September of 2007, Dr. Herndon was replaced as her residency program director (though he remained the director of the overall residency program and a member of HCORP's executive committee).  She nevertheless complains that retaliation persisted through her graduation from the program in June of 2008.[2]

_____

[2] The claimed retaliation between September 2007 and June 2008 appears to consist primarily of the executive committee's poor handling of her complaint regarding a pair of obscene e-mails circulating among HCORP residents and a "walk-out" of her graduation-day thesis presentation by her fellow residents.  As to the latter event, Dr. Shervin claims that members of the executive committee were aware that a walk-out was planned and did nothing to prevent it.

- 10 -

There was more. Dr. Shervin complains that, from July of 2007 to April of 2008, officials of both Harvard and Partners falsely assured her that her probation would not need to be reported outside the program (such as to state licensing authorities or prospective employers). These assurances, she says, discouraged her from immediately pursuing her grievance rights within the program. Moreover, the assurances were not true; her probation resulted in both a delay in the issuance of her license to practice medicine and the issuance of only a limited license in her fellowship year.[3]

According to Dr. Shervin, retaliatory acts continued even after her residency ended. For one thing, she says that the formal grievance process that she undertook in 2008 and 2009 (which resulted in an affirmation of the probation decision) was marred by bias, falsehoods, and insufficient procedures. For another thing, she says that the defendants deliberately blocked her from at least three job opportunities in Massachusetts hospitals during the 2009-2012 time frame.

---

[3] Although the delay in the issuance of her license to practice medicine resulted in a postponement of the start of her fellowship, she successfully completed the fellowship in 2009.

With this factual predicate in mind, we turn to the merits of the district court's summary judgment ruling. We review that determination de novo. See Noviello, 398 F.3d at 84. To avoid "the swing of the summary judgment scythe," Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003), the non-moving party (here, Dr. Shervin) bears the burden of pointing to admissible evidence showing the existence of a genuine issue of material fact, see Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996). The non-movant may not rely on "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

In this case, the court below considered full briefing and heard protracted arguments on the motions for summary judgment. It concluded that all conduct predating June 5, 2008 (or December 30, 2008 for Harvard) was time-barred as a basis for either finding liability or awarding damages on the discrimination and retaliation claims. See Shervin, 2 F. Supp. 3d at 72; see also 42 U.S.C. § 2000e-5(e)(1) (setting forth applicable 300-day statute of limitations); Mass. Gen. Laws ch. 151B, § 5 (similar). The court then entered partial summary judgment to this effect, leaving open Dr. Shervin's other claims. The court's ruling allowed Dr. Shervin to introduce, as context evidence, proof about how she was

- 12 -

placed on probation and the time-barred acts of alleged retaliation. See id. at 71 n.10.

## c.

Before us, Dr. Shervin argues that the district court erred in calibrating the statute of limitations for her discrimination and retaliation claims. As a threshold matter, she insists that her claims did not accrue until the probation hindered her ability to obtain a medical license in the summer of 2008. We do not agree.

Under both federal and state law, a cause of action for discrimination or retaliation accrues when it has a crystallized and tangible effect on the employee and the employee has notice of both the act and its invidious etiology. See Thomas v. Eastman Kodak Co., 183 F.3d 38, 50 (1st Cir. 1999); Wheatley v. Am. Tel. & Tel. Co., 636 N.E.2d 265, 268 (Mass. 1994); Adamczyk v. Augat, Inc., 755 N.E.2d 824, 829 (Mass. App. Ct. 2001). Here, Dr. Shervin was convinced from the outset that discrimination and retaliation were at work. Thus, her thesis boils down to a contention that the probation decision had no tangible, concrete effect either on her career or her employment as a medical resident until mid-2008.

This contention is untenable. As no less an authority than the Supreme Court has stated, "[t]he proper focus" for determining when a cause of action accrues for limitations purposes

"is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." Del. State Coll. v. Ricks, 449 U.S. 250, 258 (1980) (emphasis omitted) (quoting Abramson v. Univ. of Haw., 594 F.2d 202, 209 (9th Cir. 1979)); accord Sch. Comm. of Brockton v. MCAD, 666 N.E.2d 468, 472 n.8 (Mass. 1996).

It is nose-on-the-face plain that Dr. Shervin had notice almost immediately after being placed on probation that this disciplinary action was both tangible and concrete: her probation was unconditional and instantly resulted in the imposition of a series of burdensome conditions (such as heightened supervision, more frequent evaluations, and a ban on any outside work). Moreover, context is always important — and it is significant that the probation here occurred in the course of a prestigious and highly competitive academic medicine residency at a world-famous group of teaching hospitals. In that milieu, probation was not — as Dr. Shervin would now have us believe — akin to sending a high school student to after-class detention. Rather, it was an ugly blot on an otherwise glittering record of accomplishment — and something to be taken quite seriously.

Indeed, both Dr. Shervin and her mentor, Dr. Burke, recognized the gravity of the probation placement immediately. That was why, from the very outset, Dr. Shervin fought so hard to

- 14 -

reverse or expunge it.  Given the record in this case, it strains credulity to suggest that probation was something to be taken lightly.[4]

Dr. Shervin's self-serving averments regarding assurances about the innocuous long-term effects of her probation do not alter our conclusion.  During the period of roughly 300 days from the time her probation was imposed until November of 2007, virtually all of the information that Dr. Shervin received about the reporting of probation pointed unerringly in the opposite direction.  For example, Dr. Herndon informed her from the very beginning (both orally and in writing) that probation could have a significant negative impact on her licensure, board certification, and job prospects.  So, too, Dr. Burke — as early

_____

[4] In support of her argument that she could not have successfully challenged her probation before August of 2008, Dr. Shervin relies heavily on an unpublished district court decision in which the court concluded that probation imposed on a medical resident did not amount to a materially adverse employment action. See Badgaiyan v. Principi, No. 04-12031, 2007 WL 1464604 at *1 (D. Mass. May 21, 2007).  The Badgaiyan decision turns on its own facts and idiosyncratic posture.  For that reason, it cannot support the weight that Dr. Shervin piles upon it.  And in any event, the decision is of questionable validity.  After all, this court has held that even a strongly worded warning letter placed in a personnel file, without more, was a sufficiently crystallized form of harm to start the running of the limitations period.  See Miller v. N.H. Dep't of Corr., 296 F.3d 18, 22 (1st Cir. 2002).

as April of 2007 — expressed his deep concern about the long-term effects of probation, writing to HCORP's executive committee that "probation, if allowed to stand, is such a serious disciplinary action that it will be required to be reported on every job or fellowship application and on every state licensure renewal." Dr. Shervin does not deny that she knew about this letter and its contents. To round out the picture, the Director of the Office of Women's Careers at MGH warned Dr. Shervin in July of 2007 that probation "MAY need to be reported" depending on the specific questions asked on state or hospital licensing forms.

To be sure, in November of 2007, MGH's chief medical officer (Dr. Britain Nicholson) asked Dr. Burke to advise Dr. Shervin that she should just "accept the probation" since it was an internal matter that did not need to be reported externally. He emphasized that her probation ought not to be the focus of future references. But that opinion, standing alone, did not erase the very real effects that probation already had wrought on the terms and conditions of Dr. Shervin's residency. See, e.g., Miller v. N.H. Dep't of Corr., 296 F.3d 18, 22 (1st Cir. 2002). Nor was there a reasonable basis for believing that persons who might subsequently be tasked with writing references would see the matter the same way; there were simply too many contrary indications. Under these circumstances, the evidence about what was said to Dr.

Burke in November of 2007 was not significantly probative as to whether the alleged discrimination was likely to cease and, therefore, could not defeat summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The short of it is that Dr. Shervin's knowledge of the probation and its immediate, tangible effects, together with her loudly bruited belief that the probation decision was a form of disparate discipline motivated by gender discrimination, is all that was needed for her cause of action to accrue and the limitations clock to begin to tick. See Miller, 296 F.3d at 22; Wheatley, 636 N.E.2d at 268; Adamczyk, 755 N.E.2d at 829.

## D.

Dr. Shervin next contends that the district court should have applied an exception to the statute of limitations known as the continuing violation doctrine. See 804 Mass. Code Regs. 1.10(2) (stating that "the 300 day requirement shall not be a bar to filing in those instances where facts are alleged which indicate that the unlawful conduct complained of is of a continuing nature"). Under Massachusetts law, the continuing violation doctrine serves as an exception to the statute of limitations only if three prerequisites are satisfied. A plaintiff who seeks to derive the benefit of the continuing violation doctrine bears the burden of establishing all three of its elements. See Cuddyer v.

- 17 -

Stop & Shop Supermkt. Co., 750 N.E.2d 928, 941-42 (Mass. 2001); Ocean Spray Crans., Inc. v. MCAD, 808 N.E.2d 257, 266-67 (Mass. 2004).

First, the claim must be one that arises from "a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." Cuddyer, 750 N.E.2d at 936. Second, the claim must be "anchored" by at least one incident of discrimination or retaliation transpiring within the limitations period. Noviello, 398 F.3d at 86; see Cuddyer, 750 N.E.2d at 938. This anchoring event must be "substantially relate[d]" to earlier instances of discrimination or retaliation and must contribute to the continuation of the pattern of conduct that forms the basis of the claim. Cuddyer, 750 N.E.2d at 938; see Noviello, 398 F.3d at 86. Third, the plaintiff must show that a reasonable person in her circumstances would have refrained from filing a complaint within the limitations period. See Cuddyer, 750 N.E.2d at 942. On this final element, the inquiry becomes whether the plaintiff knew or reasonably should have known within the limitations period both that her work environment was discriminatory and that the problems she attributed to that discriminatory environment were unlikely to cease. See id.; see also Ocean Spray, 808 N.E.2d at 269 (explaining that the limitations period begins when "the employee

- 18 -

knew or reasonably should have been aware that the employer was unlikely to afford him a reasonable accommodation").  As to the likelihood vel non of improvement, the question is whether the plaintiff's "delay in initiating the lawsuit, considered under an objective standard, was unreasonable," and summary judgment may be appropriate on this element "where a pattern of harassment, considered from the viewpoint of a reasonable person in the plaintiff's position, is so sufficiently known, pervasive, and uncorrectable" that it would be unreasonable to delay filing suit. Cuddyer, 750 N.E.2d at 941-42.

In this instance, we can proceed directly to the third step of the continuing violation inquiry.  Even if the time-barred acts alleged by Dr. Shervin satisfy the first two elements — a matter on which we take no view — her claim falters at the third step.[5]

---

[5] In reaching this conclusion, we need not address Dr. Shervin's remonstrance that the district court misapplied Massachusetts law in concluding that her claim was not of the sort to which the continuing violation doctrine may apply.  Our review is de novo, and we may affirm the entry of summary judgment on any basis made manifest by the record.  See Gillen v. Fallon Ambul. Serv., Inc., 283 F.3d 11, 28 (1st Cir. 2002).

Dr. Shervin does not dispute — nor could she — that she knew of the alleged incidents of retaliation and discrimination and regarded them as pervasive. It is undisputed on the summary judgment record that Dr. Shervin came to believe almost immediately after the February 2007 meeting that Dr. Herndon had discriminated against her based on gender and that she was experiencing a continuing stream of related discriminatory and retaliatory acts. Her own deposition testimony indicates that she expressed specific concerns about discrimination to Dr. Rubash as early as March of 2007 and specific concerns about retaliation to the executive committee the following month.

Of course, under the continuing violation doctrine as formulated by the Massachusetts courts and the MCAD, a person's "awareness and duty" to bring suit, Ocean Spray, 808 N.E.2d at 267, arises only when the person has good reason to believe that her "problems would [not] cease," Cuddyer, 750 N.E.2d at 942. Here, Dr. Shervin adduced no probative evidence that, during the 300 days following either the February 2007 probation decision or Dr. Rubash's March 2007 comments, she thought it likely that her discriminatory treatment would cease. Indeed, Dr. Shervin's complaint characterized her experience after she challenged the probation decision as a "witch hunt and a campaign . . . waged hour to hour, day to day, weeks on end with no resolution in

- 20 -

sight."    She  further  declared  that  the  "retaliation  and
discrimination  continued  unabated"  even  after  both  she  and  Dr.
Burke  reached  out  to  Partners  and  Harvard  for  assistance.

These  statements  make  pellucid  Dr.  Shervin's  early
awareness  of  both  her  plight  and  its  unrelenting  nature.    The
record  evidence  tells  the  same  tale.    It  convincingly  shows,  as
early  as  March  of  2007,  that  Dr.  Shervin  was  keenly  aware  that
probation  entailed  immediate  negative  effects,  had  potentially
deleterious  long-term  consequences,  and  was  not  likely  to  be
rescinded.    And  matters  went  downhill  from  there:  by  June,  the
executive  committee  had  ratified  the  probation  decision  (using  a
process  that  Dr.  Shervin  at  the  time  found  fundamentally  unfair)
and  Dr.  Herndon — backed  by  the  executive  committee — had  extended
the  probationary  period  by  three  months  on  the  basis  of  complaints
that  Dr.  Shervin  believed  were  trumped  up  and  inadequately
investigated.

A  reasonable  person  in  Dr.  Shervin's  shoes,  knowing  the
immediate  downside  of  probation  and  its  potentially  detrimental
effects  on  her  future  career,  could  not  plausibly  have  thought
that  her  discriminatory  treatment  was  likely  to  abate.    This  is
especially  true  since  she  professed  to  believe  that  the
decisionmakers  who  had  the  power  to  furnish  a  remedy  were  taking
biased  views  of  her  evaluations,  searching  for  fault,  and  "building

a case against [her]."  Though some modest ameliorations did occur (such as in September of 2007 when her probation was finally lifted and Dr. Herndon was replaced as her residency director), those ameliorations apparently did nothing to relieve Dr. Shervin's sense that she was under siege.  Contemporaneously, Dr. Shervin complained to HCORP's administration about e-mails sent to the resident community from the e-mail accounts of other residents — e-mails that she perceived to be offensive to women.  She had requested confidentiality for her report and, when another resident accused Dr. Shervin of being the source of the complaint, she concluded that a leak had occurred as part of the ongoing campaign of retaliation.  Even when she met with Dr. James Kasser in September of 2007 and learned that she had been taken off probation, she told him of her continuing feeling of being threatened, unsafe, and harassed in the program.  Those fears were exacerbated when, according to Dr. Shervin, Dr. Kasser told her that the executive committee would "continue to probe at residents to find any fault with [her]" and expressed concerns about her professional behavior (which she thought made "no sense" in the context of her efforts while on probation).  In the same time frame, she also was pointedly informed by one of her supervising physicians that "people were out to get [her]," so that she ought to "watch [her] back."  In Dr. Shervin's own words, "[t]he

retaliatory atmosphere continued" even after the lifting of her probation.

An assertion that a situation seemed likely to improve must be grounded on more than rhetoric. Here, nothing transpired that would have sufficed to ground an objectively reasonable belief that what Dr. Shervin regarded as a pattern of discrimination and retaliation would dissipate.

Nor are the assurances that Dr. Shervin allegedly received about the long-term effects of her probation adequate to create a genuine dispute as to the footing for a reasonable belief that her situation was likely to be "successfully remedied." Id. at 942. In arguing for a contrary conclusion, Dr. Shervin points to at least two instances of supposedly equivocal or ultimately incorrect advice that she received throughout 2007 about the impact of probation on her medical licensure: the executive committee's statement in June that many other residents had resolved problems "without any negative consequences," and assurances from Dr. Nicholson in the fall that the probation was purely internal and not reportable to the licensing board.[6] These statements, however,

_____

[6] What Dr. Shervin suggests are other indications that her probation might be removed from her record occurred in 2008. Consequently, they could not have supported a reasonable belief

- 23 -

are not probative of whether Dr. Shervin reasonably could have believed that her work environment would improve. Whether or not her probation was reportable would not affect the duration or conduct of the campaign of discrimination and retaliation which Dr. Shervin believed was afoot from and after the moment she was placed on probation. And in all events, Dr. Shervin does not claim that these assurances were products of a discriminatory or retaliatory animus as opposed to confusion, mistake, or subsequent changes in the licensing board's regulations.

To sum up, Dr. Shervin knew, from the time her probation was imposed in February of 2007, that probation had materially adverse ramifications both for the rest of her residency and (at least potentially) for her future career. She formed an almost immediate belief, never diluted, that her probation was sparked by gender bias; and she likewise came to believe, within a matter of weeks, that this change in her status was merely the beginning of a pervasive pattern of discriminatory and retaliatory acts. Nor had she shown any reasonable basis for hoping that the situation would improve: the executive committee rebuffed her attempt to

that Dr. Shervin's situation would improve within the 300-day limitations period following the February 2007 probation decision.

- 24 -

have the probation decision reversed in June of 2007, the term of her probation was extended shortly thereafter, and acts that she believed to be discriminatory and retaliatory continued to occur.

The bottom line is that the record, even when taken in the light most hospitable to Dr. Shervin, does not support a finding that a reasonable person in Dr. Shervin's circumstances would have thought her situation apt to improve within the limitations period. See generally Cuddyer, 750 N.E.2d at 941-42 (setting forth the "guiding principles to be applied by a judge deciding a motion for summary judgment" with respect to the continuing violation doctrine). While Dr. Shervin has pointed to bits and pieces of an extended dialogue that might, if taken in a vacuum, support her contrary position, we are obliged to view the summary judgment record as a whole. See, e.g., Mesnick v. Gen. Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991). So viewed, there is no "significantly probative" evidence, Anderson, 477 U.S. at 249-50, to underpin a finding that Dr. Shervin can satisfy the third element of the Massachusetts continuing violation framework. It follows inexorably that the district court did not err in holding that Dr. Shervin's time-barred discrimination and retaliation

claims could not be rescued through the continuing violation doctrine.[7]

## E.

In an effort to turn the tide, Dr. Shervin strives to convince us that there are two other grounds on which a jury might have found that her discrimination and retaliation claims avoided the limitations bar.  We are not persuaded.

Dr. Shervin begins with a suggestion that the statute of limitations was tolled by her pursuit, starting in March of 2007, of an internal grievance under her employment contract.  We need not linger long over this suggestion.  Massachusetts recognizes an exception to the statute of limitations when an aggrieved party enters into grievance proceedings "pursuant to an employment

---

[7] Although Dr. Shervin's briefing lacks crystalline clarity on this point, she appears to limit her attack on the district court's construction of the continuing violation doctrine to her state-law discrimination and retaliation claims.  Even so, we note (for the sake of completeness) that where, as here, a claim involves a pattern of conduct which includes a discrete act that may itself be actionable, the continuing violation doctrine is arguably more accommodating under Massachusetts law than under federal law.  See Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130, 131 n.8 (1st Cir. 2009) (comparing federal and Massachusetts law with respect to continuing violation doctrine).  Accordingly, any challenge to the court's refusal to apply the continuing violation doctrine to Dr. Shervin's federal claims would perforce fail.

contract" within 300 days from the challenged conduct. 804 Mass. Code Regs. 1.10(2). The district court ruled that this exception did not apply because the MCAD has interpreted the regulation as applying only to those grievance proceedings undertaken pursuant to collective bargaining agreements. See Shervin, 2 F. Supp. 3d at 62-64; see also Hall v. FMR Corp., 559 F. Supp. 2d 120, 125 (D. Mass. 2008) (discussing underlying MCAD decision in which agency formally took this position); Cuddyer, 750 N.E.2d at 938 (noting Massachusetts courts' consistent deference to MCAD decisions and policies). Dr. Shervin insists that this is an incorrect reading of Massachusetts law and that she properly invoked her grievance rights by a letter to the HCORP executive committee dated March 27, 2007.

We need not delve into the district court's rationale because Dr. Shervin did not invoke the grievance process in March of 2007. We divide our explanatory comments into two segments, consistent with the fact that Dr. Shervin's employment contract incorporated both an adverse action process and a redress of grievance process.

The adverse action process pertains only to certain enumerated adverse actions, not including probation, and Dr. Shervin was told that probation was not considered an adverse action. Perhaps more importantly, that process sets out procedural

- 27 -

rules to be followed by the hospital in taking such an action against a trainee. It does not provide a mechanism through which a resident or other employee can initiate complaints against her employer. It is, therefore, impuissant as a means of accessing the grievance exception.

The redress of grievance process is a different matter. That process applies to "[g]rievances pertaining to the training program, faculty, or work environment." Thus, the redress of grievance process applies on its face to a person in Dr. Shervin's position.

But there is a rub: under the redress of grievance process, grievances must "first be directed to the training program director in writing, and copied to the Service Chief and the Director of Graduate Medical Education." The program director then has two weeks to respond. If a response is not forthcoming or is unsatisfactory, the trainee may then request a hearing.

Dr. Shervin's letter simply did not invoke this process — and it was never construed as invoking it. The letter, which was addressed to the chair of HCORP's executive committee, was copied only to other committee members. The redress of grievance process was not mentioned. The ad hoc nature of Dr. Shervin's letter and her failure to initiate the redress of grievance process

were confirmed by her subsequent interactions with Partners' staff and HCORP.

When Dr. Shervin's letter was received, HCORP undertook what it described as "an informal[] review." In late April, Partners' vice president for graduate medical education, Dr. Debra Weinstein, reminded Dr. Shervin that she could "utilize the Partners resident grievance process at any time." Dr. Shervin took no action in response to this reminder; for aught that appears, she neither sought to avail herself of the grievance process nor sought to go beyond the informal review that had been provided.

The executive committee informed Dr. Shervin on June 6 that it had completed its informal review. Thereafter, Dr. Shervin took no action anent grievance proceedings until the spring of 2008, when she brought concerns about her medical licensure to officials at Partners. Even at that stage, the record makes manifest that both she and Partners believed that she had not activated the redress of grievance process. It was not until late March of 2008 that Dr. Shervin asked to meet with Partners' officials to learn about "options . . . for addressing grievances." She received a reply less than a week later, reminding her of the redress of grievance process. In May of that year, Dr. Shervin

noted in an e-mail that she had not yet "initiate[d] a formal grievance process."

In light of the consistent interpretation placed by both Partners and Dr. Shervin on her March 27 letter and the actions that ensued, we think it crystal clear that Dr. Shervin did not invoke the redress of grievance process by means of that letter.

That is game, set, and match.  Even if we assume that the redress of grievance process, if properly invoked, would engage the gears of the grievance exception, Dr. Shervin cannot benefit from that exception.[8]

Finally, we agree with the district court that there is no cognizable basis for equitable tolling here.  In Massachusetts, such an extraordinary remedy is applied "sparingly in employment discrimination cases."  Adamczyk, 755 N.E.2d at 830.  Invoking such a palliative is permitted when, say, "the plaintiff is excusably ignorant about the . . . statutory filing period, or where the defendant or the MCAD has affirmatively misled the plaintiff."  Andrews v. Arkwright Mut. Ins. Co., 673 N.E.2d 40, 41

---

[8] To be sure, Dr. Shervin did trigger the redress of grievance process by letter dated August 7, 2008.  She has not relied on that letter; and in all events, any tolling effect attributable to that letter would come too late to sweep in Dr. Shervin's time-barred allegations.

(Mass. 1996) (citation omitted). So, too, the doctrine can be employed where "the potential defendant encourages or cajoles the potential plaintiff into inaction." Cherella v. Phoenix Techs. Ltd., 586 N.E.2d 29, 31 (Mass. App. Ct. 1992). None of these scenarios is present in this case — and as we explain below, nothing of comparable magnitude transpired here.

To begin, Dr. Shervin does not plead ignorance about the filing period. Second, though Dr. Shervin maintains that she was misled about the impact of her probation on her future licensure, she does not suggest that she relied on any such misrepresentations in considering whether or when to file her complaint. The mere fact that Dr. Shervin may have relied on some misrepresentations by the defendants for other purposes does not establish the necessary linkage between those misrepresentations and her delay in bringing her complaint. See English v. Pabst Brewing Co., 828 F.2d 1047, 1049 (4th Cir. 1987) ("To invoke equitable tolling, the plaintiff must therefore show that the defendant attempted to mislead him and that the plaintiff reasonably relied on the misrepresentation by neglecting to file a timely charge."). Given this record, we discern no plausible basis for a claim of equitable tolling. See, e.g., Rivera-Díaz v. Humana Ins. of P.R., Inc., 748 F.3d 387, 390 (1st Cir. 2014).

## **F.**

That ends this aspect of the matter.  Because all the broadsides that Dr. Shervin aims at the district court's entry of partial summary judgment miss the mark, we uphold the district court's calibration of the limitations period and, thus, its summary judgment ruling.

## III.  RECUSAL

Dr. Shervin argues that a new trial is necessary because the district judge failed to recuse herself when an appearance of partiality arose.  See 28 U.S.C. § 455(a).  This argument is doubly waived.

## **A.**

We set the stage.  Dr. George Dyer was a resident in orthopedics at MGH during Dr. Shervin's residency (one year ahead of her) and, in early 2007, reported to Dr. Herndon concerns about Dr. Shervin's performance.  In ruling on a motion to quash discovery subpoenas, the district judge noticed that documents relating to Dr. Dyer were included among the requests.  The district judge promptly disclosed that Dr. Dyer is her first cousin.  She added that she did not consider this relationship to be a basis for recusal, but she nonetheless invited the parties to register any concerns that they might have with the court.  Dr. Shervin did not voice any objections, nor did she urge the judge's

recusal at any point. She likewise remained silent when Dr. Dyer was identified to the jury as a fact witness in the opening statements of two of the defendants (Partners and Dr. Herndon), which were delivered before the first witness was sworn.

Near the end of her case in chief, Dr. Shervin called Dr. Dyer as a hostile witness. During direct examination, the district judge sustained defense objections to several questions aimed at developing an ostensible inconsistency in Dr. Herndon's testimony — an inconsistency that purportedly arose because Dr. Herndon testified that Dr. Dyer reported his concerns in a meeting where another resident was present, while Dr. Dyer said in his deposition that he and Dr. Herndon had met alone.

After declining to undertake redirect examination and releasing the witness, Dr. Shervin's counsel requested a sidebar conference. At sidebar, she stated that she was "concerned about the way in which this witness was handled by the court" and asked the judge to inform the jury of her relationship with the witness and/or to read Dr. Dyer's deposition testimony into the record. She did not, however, ask the judge to recuse herself.

When defense counsel pointed out that the judge had previously disclosed her relationship to Dr. Dyer and no objection had been forthcoming, Dr. Shervin's counsel responded: "I withdraw my request," presumably referring to both of her curative requests.

To dispel any further doubt on this issue, the district judge formally denied the remedies sought by Dr. Shervin's counsel, noting for the record the "nature of the examination" of Dr. Dyer and her "prior disclosure on the record" of her relationship to Dr. Dyer. The judge added that she had sustained the defendants' objections because the questions were improper in form, and the statements sought to be introduced as prior inconsistent statements did not appear to be inconsistent with Dr. Dyer's deposition testimony.

### B.

Against this backdrop, Dr. Shervin argues that the judge's obligation to recuse herself blossomed when counsel pointed out that the judge, knowing that Dr. Dyer's deposition testimony was inconsistent with his testimony on the stand, foreclosed "efforts to impeach Dyer with his prior deposition testimony and did not permit explanation of counsel's concerns until the witness was excused." This argument stumbles at the starting gate.

In this case, the judge forthrightly disclosed her relationship to the witness prior to trial and provided ample opportunity for the parties to move for recusal. Dr. Shervin did not seek the judge's disqualification but, rather, by her silence acquiesced in the judge's continued participation. That was a

waiver, pure and simple. See, e.g., In re Cargill, Inc., 66 F.3d 1256, 1261 (1st Cir. 1995) ("[W]aivers based on silence are standard fare."). Where, as here, the putative ground for recusal involves only an asserted appearance of partiality and thus rests solely on 28 U.S.C. § 455(a), a judge is permitted to accept a party's waiver as long as that waiver is preceded by a full disclosure of the alleged basis for disqualification. See 28 U.S.C. § 455(e); see also Cargill, 66 F.3d at 1261; El Fenix de P.R. v. M/Y JOHANNY, 36 F.3d 136, 141 (1st Cir. 1994). It follows that Dr. Shervin cannot now be heard to complain that the judge should have recused herself despite the parties' informed willingness to have her preside.

Nor did subsequent developments in the trial mandate the judge's recusal. To begin, Dr. Shervin's counsel never asked the judge to step down, even when she expressed her concerns about the judge's handling of Dr. Dyer. And with respect to the relief that she did request, there was a second waiver. At the sidebar conference following Dr. Dyer's direct examination — which occurred near the end of trial — Dr. Shervin's counsel was reminded of her earlier acquiescence, and she then withdrew her request for any curative action. That, too, was a waiver — an intentional relinquishment of a known right. See, e.g., United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002) (explaining that "[a]

- 35 -

party who identifies an issue, and then explicitly withdraws it, has waived the issue").

We need not tarry. The district judge performed admirably in managing a highly contentious trial. There is no claim of any actual bias on her part — and the record reveals no footing for any such claim. As a general rule, a party is not entitled to relief on appeal that she did not seek below. See, e.g., Cahoon v. Shelton, 647 F.3d 18, 29 (1st Cir. 2011); Beaulieu v. IRS, 865 F.2d 1351, 1352 (1st Cir. 1989). This case falls comfortably within this general rule, not within the long-odds exception to it. We find, without serious question, that the district judge did not err by failing to recuse herself sua sponte despite the parties' tacit agreement that she continue to preside.

## IV. EVIDENTIARY RULINGS

Dr. Shervin takes issue with a host of evidentiary rulings that she says deprived her of the ability to present critical evidence of discrimination and retaliation. We review rulings admitting or excluding evidence for abuse of discretion. See Torres-Arroyo v. Rullán, 436 F.3d 1, 7 (1st Cir. 2006); Gomez v. Rivera Rodríguez, 344 F.3d 103, 114 (1st Cir. 2003). Here, we have examined all of Dr. Shervin's claims with care. Many relate to rulings limiting evidence of the experiences of other individuals who had allegedly faced gender-based discrimination or

retaliation at the hands of one or more of the defendants. Others relate to the exclusion of evidence that Dr. Shervin hoped would show differential treatment in disciplinary or hiring contexts or, alternatively, would provide additional background information on the culture at MGH and its department of orthopedics.

It would serve no useful purpose to plow through all of these claimed bevues one by one. Here, it suffices for the most part to say that after perscrutation of the record and the parties' arguments, we are satisfied that the district court did not abuse its discretion in excluding this evidence, particularly since much of it was either cumulative, attenuated from the issues underlying the litigated claims, peripheral, overly conducive to creating juror confusion, or unfairly prejudicial to one or more of the defendants.

This omnibus ruling reflects our awareness that trial courts enjoy a superior "coign of vantage" in undertaking the "delicate balancing" required to make these kinds of evidentiary determinations. Fitzgerald v. Expressway Sewerage Constr., Inc., 177 F.3d 71, 75 (1st Cir. 1999). Given the district court's evident solicitude for policing the bounds of relevancy and keeping the jury focused on the issues in the case, we are unwilling to disturb the district court's first-hand assessment of much of the proffered evidence.

There are, however, three evidentiary rulings that —
though supportable — deserve more exegetic treatment. Each of
these three rulings excluded an out-of-court statement offered by
Dr. Shervin as evidence of retaliatory animus. She asserts that
these statements qualify as non-hearsay under various exceptions
to the hearsay rule, and that the court's exclusionary rulings
were so uniquely important and so egregiously wrong that they
eroded the foundation of her case.

Before turning to these three challenges, we summarize
a few first principles. Out-of-court statements, not made under
oath, are generally regarded as hearsay evidence and, thus, are
presumptively inadmissible to prove the truth of the matter
asserted. See Fed. R. Evid. 801(c), 802. There are several
circumstances, however, in which such statements can shed their
hearsay character and become eligible for admission into evidence
to prove the truth of the matter asserted. See id. 801(d). Yet
even then, out-of-court statements — like other pieces of evidence
— must pass through further screens: they may be excluded on, say,
relevancy grounds, see id. 401, or on grounds of undue prejudice,
waste of time, potential for jury confusion, and the like, see id.
403. It is against this backdrop that we approach the task at
hand.

<u>A.</u>

Dr. Shervin sought to elicit through the testimony of Partners' former board chair that MGH's CEO, Dr. Peter Slavin, had once told him that "there's not a court in the land that could force me to hire Dr. Shervin back." Dr. Shervin sought to admit this hearsay statement to show bias against her in the upper echelons of MGH and to explain Partners' interference with a potential job at Cooley Dickinson Hospital (Cooley).

The relevant facts are as follows. Cooley — a hospital not then affiliated with Partners — offered Dr. Shervin a position in the spring of 2012. The offer was withdrawn, however, before she could accept it. In the same time frame, Cooley was in merger talks with MGH. Building on this foundation, Dr. Shervin contends that Dr. Slavin's comment could have supported an inference that he (or others following his orders) used the relationship with Cooley officials to stifle her job offer. This led to Dr. Shervin's attempt to introduce evidence of Dr. Slavin's hearsay statement, but when defense counsel objected to the questioning of the board chair about this statement, the district court sustained the objection.

Although the challenged statement, if viewed in isolation, may seem to boost Dr. Shervin's theory of the case, the evidence as it unfolded at trial tells a more nuanced tale. Dr.

Shervin did not establish through either evidence or proffer when the statement was alleged to have been made by Dr. Slavin, nor did she connect this statement in any way to Cooley's withdrawal of the job offer. What is more, Dr. Shervin did not adduce a shred of evidence showing that Dr. Slavin was himself a decisionmaker with regard to the Cooley job offer or that he in any way influenced or attempted to influence Cooley's decision not to hire Dr. Shervin. Indeed, there is no evidence that Dr. Slavin ever spoke to or otherwise communicated with anyone at Cooley.

In excluding the challenged statement, the district court relied on Federal Rule of Evidence 403. That rule requires a court to balance the probative value of particular evidence against the unfairly prejudicial effect of that evidence. See United States v. Mehanna, 735 F.3d 32, 59 (1st Cir. 2013), cert. denied, 135 S.Ct. 49 (2014). Without more meat on the bones, this lone remark was hardly probative of any actual influence by the defendants on the withdrawal of the job offer from Cooley. See, e.g., Lewis v. City of Chi. Police Dep't, 590 F.3d 427, 441-43 (7th Cir. 2009) (noting, in employment discrimination case, that comments of non-decisionmakers had little probative value as to the intent or mindset of the decisionmakers).

To be sure, we explained in Travers v. Flight Services & Systems, Inc., 737 F.3d 144 (1st Cir. 2013), that even without

direct evidence of causation a jury may reasonably infer that the wishes of a "king" often will be carried out by his "courtiers" when other evidence shows that retaliatory animus resides at the "apex of the organizational hierarchy." Id. at 147. But Travers is distinguishable in many respects. First, the excluded statement here was much more like the (nonprobative) "stray," "stale," or "ambiguous" comments contrasted by the Travers court with the (probative) "strongly held," "repeatedly voiced," and precise directives of the CEO. Id. It is only the latter that Travers said may permit an inference that animus was communicated throughout the organization. Second, Dr. Slavin's comment was not made to an underling who might have been inclined to curry favor by carrying out his directives. See id. Last — but far from least — Dr. Slavin did not occupy the apex of Cooley's organizational hierarchy (indeed, he was not part of that hierarchy). And although one can speculate that the pendency of merger negotiations may have accorded Dr. Slavin's views some weight if made known to the prospective merger partner, there is nothing in the record that suggests he ever communicated those views to Cooley's decisionmakers (or, for that matter, to anyone associated with Cooley).

When, as in this instance, highly charged evidence is of doubtful probative value, it may be excluded. See, e.g., Williams

- 41 -

v. Drake, 146 F.3d 44, 48-49 (1st Cir. 1998).  The case for exclusion is stronger, of course, "where, as here, the evidence has a high potential for unfair prejudice."  Downey v. Bob's Disc. Furniture Holdings, Inc., 633 F.3d 1, 9 (1st Cir. 2011).  These tenets are controlling.  Given that the challenged statement was both incendiary in nature and offered without any supporting evidence that would have tethered it to the situation that played out at Cooley, we cannot say that the court below abused its discretion in striking the Rule 403 balance in favor of exclusion. After all, "[o]nly rarely — and in extraordinarily compelling circumstances — will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect."  Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988).

## B.

Dr. Shervin attempted to introduce evidence, through the testimony of the former CEO of Milton Hospital (Milton), that Dr. Gebhardt, the chief of the orthopedics department at BIDMC, blocked Dr. Shervin's hiring at Milton (a BIDMC affiliate) in the summer of 2012.  This evidence comprised out-of-court statements that Dr. Gebhardt would "find it difficult" to work with "a person who was suing him" and that if Dr. Shervin was permitted to work at the new orthopedics center at Milton, he would withdraw BIDMC's

- 42 -

involvement there. Dr. Shervin sought to admit Dr. Gebhardt's statements in support of her retaliation claims against Harvard and Partners, insisting that the statements were non-hearsay under Federal Rule of Evidence 801(d)(2)(D), which covers admissions of a party-opponent.

Prior to trial, Partners and other defendants (but not Harvard) moved in limine to exclude Dr. Gebhardt's statements, arguing that they were made while Dr. Gebhardt was acting under the authority of a non-party, namely, Harvard Medical Faculty Physicians, a non-profit corporation consisting of physicians employed at BIDMC. Dr. Shervin opposed this motion, postulating that Dr. Gebhardt's statements were made in his capacity as a member of HCORP's executive committee and that Partners was ultimately responsible for HCORP. The district court granted the motion in limine, concluding that the challenged statements concerned an "independent decision" by Dr. Gebhardt, which broke the causal chain needed to establish a connection to Partners. See Mole v. Univ. of Mass., 814 N.E.2d 329, 343 (Mass. 2004). Dr. Shervin provides no justification for second-guessing this determination.

During the trial, the district court carefully sifted through evidence involving statements of Dr. Gebhardt that Dr. Shervin was attempting to attribute to Partners. The court

admitted some statements that were made within the scope of Dr. Gebhardt's executive committee position (such as his statement to Dr. Burke that Dr. Shervin needed to get her head "screwed on" because she was "a woman in a man's specialty"). However, the court excluded other statements. We discern no abuse of discretion: given the evidence that Dr. Gebhardt's statements regarding Dr. Shervin's potential employment at Milton were not within the scope of his role on HCORP's executive committee, the court had sufficient reason to exclude those statements.

Alternatively, Dr. Shervin theorizes that the excluded statements were imputable to Harvard by virtue of Dr. Gebhardt's faculty appointment and his seat on HCORP's executive committee. The district court rejected this proffer, concluding that these hearsay statements were not admissible against Harvard and that any probative value was substantially outweighed by the risk of unfair prejudice.

Once again, we find no abuse of discretion. Rule 801(d)(2)(D) exempts from the definition of hearsay statements "offered against an opposing party and . . . made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Here, though, Dr. Shervin utterly failed to lay a foundation for showing that the challenged statements, any of the staffing decisions at Milton, or any purported threat

to withdraw BIDMC's medical faculty support fell within the scope of Dr. Gebhardt's Harvard faculty appointment. Thus, the excluded statements did not qualify as a party opponent's statements within the purview of Rule 801(d)(2)(D). See, e.g., Vazquez v. Lopez-Rosario, 134 F.3d 28, 34-35 (1st Cir. 1998).

Dr. Shervin has a fallback position with respect to the admissibility of these statements. She suggests that the statements should have been admitted as to Harvard for the limited purpose of impeaching Dr. Gebhardt's denial that he ever said he would not support the new center if Dr. Shervin were brought on board. See Fed. R. Evid. 613(b). But as the district court noted, the probative value of this impeachment evidence was greatly overshadowed by the fact that Dr. Shervin failed to introduce any competent evidence to prove retaliation by Harvard with respect to the position at Milton. Indeed, Dr. Shervin failed to dredge up even a scintilla of evidence showing Harvard's involvement in the selection process for this position.[9] Because there was too great

---

[9] The strongest evidence that Dr. Shervin has on this point is a posting for the position that recites that the successful applicant will receive a clinical appointment to the Harvard medical faculty and notes that Harvard is an equal opportunity employer. This evidence standing alone does not take Dr. Shervin very far.

a risk under the circumstances that the jury would consider the challenged evidence as substantive evidence against Harvard, the district court acted well within the encincture of its discretion in sustaining Harvard's objection to this evidence.  See United States v. Hudson, 970 F.2d 948, 956 n.2 (1st Cir. 1992) (upholding exclusion of evidence under Rule 403 even though evidence admissible under Rule 613(b)); see also Faigin v. Kelly, 184 F.3d 67, 80 (1st Cir. 1999) ("We are extremely reluctant to second-guess the district court's battlefield determination that the scenario at hand presented a worrisome potential for [unfair prejudice].")

## C.

The next bone of contention involves an out-of-court statement made to Dr. Burke by Dr. Joseph McCarthy, a vice-chair in the MGH orthopedics department and the director of the center for joint reconstruction at Newton-Wellesley Hospital (NWH), a Partners affiliate.  This statement was contained in an April 2009 e-mail exchange between the two doctors about the possibility of finding Dr. Shervin a position at NWH upon the completion of her fellowship.  In relevant part, Dr. Burke wrote "I am glad that you are on board with [Dr. Shervin's] NWH/MGH staff position," and Dr. McCarthy responded, "I'm glad we're on the same page with this. I'll do my part out here."  Dr. Shervin proffered this evidence,

too, as non-hearsay under Rule 801(d)(2)(D).  Its purpose, she asserts, was to refute claims that she had not been hired at NWH either because she had not formally applied for such a position or because no positions were available.

The district court excluded the statement, and Dr. Shervin assails the court's exclusionary ruling.  Some further facts are needed to put her assignment of error in perspective.

Prior to trial, Harvard moved in limine to bar the introduction of this evidence, arguing that Dr. McCarthy's statement was hearsay and that it was not admissible as a vicarious admission since Dr. McCarthy held only a clinical associate position at Harvard and, thus, Dr. Shervin could not show that any statements Dr. McCarthy made regarding hiring at MGH or NWH were within the scope of his Harvard faculty appointment.  The district court granted Harvard's motion.  When Dr. Shervin brought the issue up again at trial, the district court sustained the defendants' objections.

With respect to Harvard, there was no hint of abuse of discretion in excluding Dr. McCarthy's statement as inadmissible hearsay.  The record is bereft of any evidence that the statements fell within the scope of Dr. McCarthy's Harvard faculty appointment.  See, e.g., Lopez-Rosario, 134 F.3d at 34-35.

Switching gears, Dr. Shervin suggests that Dr. McCarthy's statement was admissible against Partners. But even if this were so — a matter on which we take no view — the statement demonstrated at most that an individual in a leadership role in orthopedics at MGH and NWH was "on the same page" as Dr. Burke about a "staff position" for Dr. Shervin.[10] What that means is amorphous. What is clear, however, is that the statement does not show that Dr. Shervin had a firm offer at NWH. Nor does it directly contradict Dr. Rubash's testimony that there were no open positions at NWH at that time.

Seen in this light, the exclusion of Dr. McCarthy's statement plainly did not have "a substantial or injurious effect on the jury's verdict." Gomez, 344 F.3d at 118. Any error in this regard was, therefore, harmless.

At the expense of carting coal to Newcastle, we add that the harmlessness of any error was ensured by the district court's

_____

[10] While this evidence also may have tended to bolster Dr. Shervin's contention that informal applications were routinely accepted at MGH even when no positions were posted, that point was made by other evidence introduced by Dr. Shervin. The exclusion of cumulative evidence is ordinarily harmless. See U.S. ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 60 (1st Cir. 2009). So it is here.

prophylactic actions.  When the court refused to allow Dr. Burke to testify about Dr. McCarthy's statement on the twentieth day of trial, it gave Dr. Shervin explicit permission to call Dr. McCarthy as a witness even though final witness lists (which did not name Dr. McCarthy) had long since been submitted.  Yet Dr. Shervin elected not to call Dr. McCarthy before she rested on the twenty-third trial day.  This was a strategic litigation choice — and a party normally is bound by such choices.  Cf. Paul Revere Var. Annuity Ins. Co. v. Zang, 248 F.3d 1, 6 (1st Cir. 2001) (stating, in different context, that "[w]here a party makes a considered choice, though it may involve some calculated risk, he 'cannot be relieved of such a choice'" even if in hindsight the decision might have been improvident (quoting Ackermann v. United States, 340 U.S. 193, 198 (1950))).

## D.

The short of it is that the challenged evidentiary rulings, whether taken singly or in the aggregate, furnish no founded basis for setting aside the jury verdict.

## V.  JURY INSTRUCTIONS

Dr. Shervin serves up a smorgasbord of claimed instructional errors — five related to instructions actually given and one related to a forgone instruction.  All six of these claims

are adequately preserved.  We preface our discussion of them with a précis of the applicable standards of review.

## A.

The standard governing an appellate court's review of a preserved claim of instructional error varies depending on the nature of the asserted error.  We review de novo questions about whether a given instruction is, in substance, legally correct.  See DeCaro v. Hasbro, Inc., 580 F.3d 55, 61 (1st Cir. 2009).  We review for abuse of discretion the particular wording chosen to convey a concept to the jury.  See Testa v. Wal-Mart Stores, Inc., 144 F.3d 173, 175 (1st Cir. 1998).  That inquiry focuses on whether the instruction "adequately illuminate[d] the law applicable to the controverted issues in the case without unduly complicating matters or misleading the jury."  Id.; see Davis v. Rennie, 264 F.3d 86, 108 (1st Cir. 2001).

When a party assigns error not to the substance of a jury instruction but to the court's decision to give a requested instruction at all, our review is de novo.  See Butynski v. Springfield Term. Ry. Co., 592 F.3d 272, 276 (1st Cir. 2010).  The ultimate inquiry is "whether the evidence, viewed in the light most favorable to the proponent of the instruction, justifies jury consideration of the underlying issue."  Id.  When, however, a party assigns error to the failure to give a requested instruction,

the threshold inquiry is whether the requested instruction was correct as a matter of law. See Elliott v. S.D. Warren Co., 134 F.3d 1, 6 (1st Cir. 1998). If the answer to that threshold inquiry is in the negative, appellate review is at an end. See United States v. DeStefano, 59 F.3d 1, 2 (1st Cir. 1995). But if the answer is in the affirmative, we will normally find reversible error if the omitted instruction is integral to an important part of the case and its content is not otherwise substantially covered by the instructions as given. See Elliott, 134 F.3d at 6; DeStefano, 59 F.3d at 2.

In mounting all of these inquiries, we examine the court's instructions as a whole, rather than reviewing fragments in isolation. See Testa, 144 F.3d at 175.

## B.

Dr. Shervin complains bitterly that the district court's statute of limitations instruction confused and misled the jury by overstating the effect of the limitations bar on her timely claims. This plaint is easily dispatched.

Mid-trial jury instructions can be a useful tool in a trial court's effort to acquaint the jury with the governing law. See, e.g., United States v. Mare, 668 F.3d 35, 40 (1st Cir. 2012). Of particular pertinence here, the district court instructed the jury on the third day of trial that:

> In this case, certain conduct is time barred
> as a matter of law from being the basis of any
> liability . . . . the plaintiff, Dr. Shervin,
> is still allowed to introduce evidence of
> certain conduct that occurred prior to those
> dates.  She may do so as background evidence
> to support her timely discrimination and
> retaliation claims.

In its end-of-case charge, the court reiterated this instruction and expanded on it, stating:

> While the [d]efendants cannot be liable to Dr.
> Shervin for any such alleged conduct before
> the respective dates I have just mentioned as
> to the discrimination and retaliation claims,
> you may, if you choose, consider such alleged
> conduct for the limited purpose of background
> evidence (i.e. as it may, for example, bear
> upon motive, intent or context) as to her
> timely discrimination and retaliation claims
> . . . .

These instructions were free from error.  In light of the district court's accurate calibration of the statute of limitations at summary judgment, see supra Part II, these instructions were proper as a matter of both federal and state law.  See Nat'l R.R. Pass. Corp. v. Morgan, 536 U.S. 101, 113 (2002); Cuddyer, 750 N.E.2d at 935 n.10, 943.  Moreover, there was no abuse of discretion in the district court's word choices: trial courts must be accorded substantial latitude about how to distill complicated legal concepts into language that jurors will understand.

Contrary to Dr. Shervin's importunings, the court's instructions made it sufficiently clear that the jury could take the time-barred evidence into account for such purposes as evaluating motive, intent, or context.

The instructions also precluded the jury from taking that evidence into account for the improper purpose of assessing liability or damages.  That was an accurate reflection of the law.  See, e.g., Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 142 (1st Cir. 2009); Cuddyer, 750 N.E.2d at 943.  The fact that the limitations instructions did not go as far as Dr. Shervin would have liked is of no consequence: a district court is not obliged to parrot the precise turn of phrase requested by a litigant.  See, e.g., Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 79 (1st Cir. 2001).  The court here adroitly threaded the needle, selecting language that did not run the risk of misleading the jury into overlooking the limitations period while still leaving open the consideration of time-barred evidence as context for Dr. Shervin's timely claims.  No more was exigible.[11]  See Morgan, 536 U.S. at

---

[11] Relatedly, Dr. Shervin suggests that the court's instructions on the statute of limitations and the aiding and abetting and interference theories of liability under Massachusetts law, together with the verdict form, somehow removed from the jury's consideration the 2009 grievance process as a

- 53 -

113; <u>Cuddyer</u>, 750 N.E.2d at 935 n.10, 943; <u>see</u> <u>also</u> <u>Elliott</u>, 134 F.3d at 7.

<u>C.</u>

Dr. Shervin calumnizes the district court's instruction on "material adverse action" in the discrimination context. She maintains that this instruction was both incorrect and apt to mislead the jury into disregarding the time-barred background evidence entirely. She specifically targets the portion of the instruction stating that "an 'adverse employment action' is one that, standing alone, actually causes damage, tangible or intangible, to an employee," positing that the phrase "standing alone" foreclosed the jury from considering the totality of the circumstances (including time-barred evidence) in evaluating whether an adverse action took place.

After careful scrutiny of the challenged instruction and the charge as a whole, we decline Dr. Shervin's invitation to hold

<hr>

potential basis for liability. We see no basis in the record for this suggestion. The district court properly instructed the jury on both aiding and abetting and interference under Massachusetts law. <u>See</u> Mass. Gen. Laws ch. 151B, § 4(4A), (5); <u>Lopez</u> v. <u>Commonwealth</u>, 978 N.E.2d 67, 78-79, 82 (Mass. 2012); <u>Melnychenko</u> v. <u>84 Lumber Co.</u>, 676 N.E.2d 45, 51 & n.8 (Mass. 1997). These instructions in no way conflicted with the limitations instructions.

that the instruction was incorrect as a matter of law. The district court did not use the phrase "standing alone" in connection with the limitations instruction but, rather, in explaining what may or may not amount to an adverse employment action. After explaining that an adverse action is one that "standing alone, actually causes damage," the court went on to distinguish between acts that might rise to the level of an adverse action (such as a decision to discharge or materially disadvantage an employee) and those acts that merely cause "subjective feelings of disappointment or disillusionment." This is a correct statement of the applicable law. See, e.g., Blackie, 75 F.3d at 725 ("Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action."). And since Dr. Shervin's discrimination claims were not tried on a hostile work environment theory, there was no error in instructing the jury that an adverse action is one that "standing alone" causes harm. See, e.g., Johnson v. Univ. of P.R., 714 F.3d 48, 53 (1st Cir. 2013) (discussing distinction between hostile work environment and discrete act claims).

We add that this instruction in no way diluted the force of the statute of limitations instruction. The discrimination instruction followed the court's limitations instruction, which

had informed the jury that it was allowed to consider time-barred evidence for such purposes as motive, intent, and context. In later describing the prima facie elements of a discrimination claim and what constitutes proof of pretext, the court placed no temporal restrictions on the evidence that could or could not inform this evaluation. In sum, the discrimination instruction was legally correct, and the court's use of the phrase "standing alone" in defining a materially adverse employment action was not an abuse of discretion.

## D.

Dr. Shervin asserts that the district court's definition of "adverse action" in its instruction on retaliation was misleading because it failed to convey to the jury that the standard for adverse action in the retaliation context is broader than in the discrimination context. But that assertion is belied by the text of the district court's instructions. The court defined "adverse action" more broadly in the retaliation instruction than in the discrimination instruction.

The discrimination instruction stated, inter alia, "[a]n employer takes an adverse action against an employee if it takes something of consequence away from the employee or fails to give the employee something that is a customary benefit of the employment relationship." The court went on to explain that "[a]n

adverse action may include a decision to terminate or discharge an employee or materially disadvantage her in respect to her salary, grade or other terms, conditions or privileges of employment." By contrast, the retaliation instruction explained that an adverse action in the retaliation context must be "materially adverse such that it could deter a reasonable person from complaining about discrimination." The court then stated, "[i]n the context of a retaliation claim, the [p]laintiff must show that she was subject to an employment action that materially disadvantaged her" and added that "an employer can retaliate against an employee by taking actions not directly related to her employment or by causing her harm outside the workplace."

These contrasting instructions were not only legally sound but also adequately articulated. See, e.g., Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006) (holding under Title VII that "the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment"); Psy-Ed Corp. v. Klein, 947 N.E.2d 520, 530 n.25 (Mass. 2011) (similar, under Massachusetts law). The court made pellucid that "adverse action" in the retaliation context is more expansive than in the discrimination context, stating that a retaliatory adverse action includes conduct that "could deter a reasonable person from

complaining about discrimination" and could encompass conduct entirely unrelated to the workplace. While the court elected not to provide certain specific examples of retaliation that Dr. Shervin had requested, this refusal was well within the ambit of its discretion. See, e.g., DeCaro, 580 F.3d at 62 ("[A] trial court is not obliged either to embellish legally correct statements or to cover every factual permutation."); see also Elliott, 134 F.3d at 6; DeStefano, 59 F.3d at 2. What counts is that the court crafted instructions that adequately conveyed these distinct concepts to the jury.

## E.

Dr. Shervin reproves the district court's "vacant position" instruction, which stated: "[t]o establish a failure to hire as an 'adverse employment action' for the purposes of a retaliation claim, [Dr. Shervin] must show by a preponderance of the evidence that: 1) she applied for a discrete, identifiable position; 2) the position was vacant; and 3) she was qualified for the position." She submits that this instruction was both incorrect as a matter of law and unwarranted on the facts. In support, she cites our decision in Velez v. Janssen Ortho, LLC, 467 F.3d 802 (1st Cir. 2006), in which we mapped out a three-part showing for claims of retaliatory failure to hire. See id. at 807; see also Pina v. Children's Place, 740 F.3d 785, 800-01 (1st

Cir. 2014) (applying same standard to ch. 151B retaliation claim).

Dr. Shervin's point is that, in her view, her case is more akin to the exception to this standard that <u>Velez</u> acknowledged in dictum. <u>See</u> <u>Velez</u>, 467 F.3d at 808 n.6 (suggesting that "if, as a matter of standard procedure, a company never advertises specific [vacant] positions" it may be inappropriate to require plaintiff to show that she applied for a specific, posted position).

Viewing the evidence in this case in the light most favorable to the defendants as the proponents of the instruction, <u>see</u> <u>Butynski</u>, 592 F.3d at 276, it cannot be said that this case presented an exception to the <u>Velez</u> prescription. The defendants adduced ample evidence that vacant positions at MGH and NWH were formally advertised in medical journals. Because there was no evidence that MGH and NWH had a standard procedure of never formally posting employment vacancies, a <u>Velez</u> instruction was permissible. <u>See</u> <u>Butynski</u>, 592 F.3d at 276; <u>see</u> <u>also</u> <u>Brown</u> v. <u>Coach Stores, Inc.</u>, 163 F.3d 706, 710 (2d Cir. 1998) (requiring plaintiff to show that she applied for particular, open positions even though employer posted such positions "infrequently").

**F.**

Dr. Shervin complains about the district court's refusal to instruct the jury in accordance with <u>Travers</u> (discussed in Part IV(A.) <u>supra</u>). In an effort to avail herself of the <u>Travers</u>

- 59 -

court's suggestion that a claim of retaliation might survive summary judgment even without "direct evidence linking the person expressing animus to the allegedly retaliatory act" so long as the animus flowed from the "apex of the organizational hierarchy" such that the person displaying the animus was "a source with the formal authority to enforce compliance," Travers, 737 F.3d at 147, she requested the following instruction:

> [Y]ou may assess whether any retaliatory or biased animus harbored and voiced by those at the top of the organization could have made its way through the organization and informed the decisions at issue here. You may consider whether the decision made reflects a reluctance to frustrate the objectives of those high up in the organization. . . . even if there is no direct or admitted evidence, no testimony or communication or no chronicling of communications between those at the apex of the organization and those who made the decisions at issue.

The district court denied this request, citing the "state of the evidence."

In considering whether the failure to give a requested instruction is error, we must first determine whether the omitted instruction was correct as a matter of law. See DeStefano, 59 F.3d at 2. Here, however, there is no evidence from which the jury reasonably could have concluded that the Travers criteria were met: the record is simply devoid of admitted evidence

sufficient to ground a finding of animus in the higher reaches of the Partners organization.

In all events, the jury was thoroughly instructed that it could consider circumstantial evidence, that it could draw reasonable inferences in light of common sense and personal experience, and that discriminatory or retaliatory animus could be established if a decisionmaker was shown either to have been influenced by, or to have ratified, another's animus. Taken in the ensemble, these various instructions covered the waterfront and addressed in substance the heart of Dr. Shervin's requested instruction. See, e.g., Zimmerman, 262 F.3d at 79-80 (concluding that omitted instruction was substantially covered where charge as a whole "sufficiently addressed the core concern" of proposed instruction); United States v. McGill, 953 F.2d 10, 13 (1st Cir. 1992) (similar). Consequently, the omission of the requested instruction did not constitute an abuse of discretion.

## G.

Last, Dr. Shervin assigns error to a statute of frauds instruction given in relation to her state-law claims of tortious interference with advantageous business relations against Partners, Dr. Rubash, and Dr. Herndon. The defendants sought such an instruction with respect to Dr. Shervin's charge that Dr. Rubash had promised her a position at MGH in 2005 but withdrew that

commitment in 2009 (allegedly as a result of Dr. Shervin's pursuit of an internal grievance and this lawsuit).

Under Massachusetts common law regarding claims of tortious interference with advantageous business relations, one way in which a plaintiff can establish the existence of an advantageous relation is to prove the existence of an enforceable contract.  See Blackstone v. Cashman, 860 N.E.2d 7, 12 (Mass. 2007); Powers v. Leno, 509 N.E.2d 46, 49 (Mass. App. Ct. 1987). But the Massachusetts statute of frauds bars the enforcement of an oral contract that cannot be performed within one year from the date of its making.  See Mass. Gen. Laws ch. 259, § 1.  This stricture extends to employment agreements.  See Irving v. Goodimate Co., 70 N.E.2d 414, 416 (Mass. 1946).  As Dr. Shervin claimed that Dr. Rubash had offered her a position at MGH in 2005 to commence after the conclusion of her residency in 2008 (and which, therefore, was not to be performed within one year from the date of its making), this purported oral contract would have been unenforceable as a matter of law and could not serve as a basis for a claim of tortious interference with an advantageous relationship in the nature of a contract.

Dr. Shervin objected to the requested instruction on the ground that no defendant had pleaded the statute of frauds as an affirmative defense.  The district court, citing Conjugal

Partnership Comprised by Jones & Jones v. Conjugal Partnership Comprised of Pineda & Pineda (Jones), 22 F.3d 391, 400 (1st Cir. 1994), overruled this objection; exercised its equitable power to bypass the raise-or-waive rule, see FDIC v. Ramirez-Rivera, 869 F.2d 624, 626 (1st Cir. 1989); and instructed the jury on the effect of the statute of frauds.

As a general matter, unpleaded affirmative defenses are deemed waived. See id. But even though the defendants never pleaded the statute of frauds as an affirmative defense, the district court did not abuse its discretion in giving the challenged instruction. We explain briefly.

A district court may relax the raise-or-waive rule when equity so dictates and there is no unfair prejudice to any opposing party. See Jones, 22 F.3d at 400. In this case, Dr. Shervin did not assert any breach of contract claims and, thus, the defendants' duty to plead an affirmative defense based on the statute of frauds was arguable at best. See Mass. Gen. Laws ch. 259, § 1 (applying statute of frauds to actions in the nature of contract). In such a situation, principles of fundamental fairness counsel in favor of giving the trial court broad discretion as to whether to allow the defense. See, e.g., Pane v. RCA Corp., 868 F.2d 631, 637 (3d Cir. 1989) (concluding that when unpleaded issue was not an affirmative defense but a standard of liability under applicable

- 63 -

statute, duty to plead not triggered and relaxation of raise-or-waive rule warranted).

By the same token, there was no unfair surprise: Dr. Shervin had ample notice prior to trial that the defendants envisioned the statute of frauds as an issue in the case. For one thing, Dr. Rubash's summary judgment motion referenced the applicability of the statute of frauds in the context of the tortious interference claims. For another thing, the defendants' proposed jury instructions, filed prior to the start of trial, included the very type of instruction at issue here. Hence, the district court did not abuse its discretion in sanctioning the statute of frauds defense. See, e.g., Agri-mark, Inc. v. Niro, Inc., 214 F. Supp. 2d 33, 43 (D. Mass. 2002).

Dr. Shervin's further argument is equally unavailing. Taking the evidence in the light most favorable to the proponents of the instruction (here, the defendants), see Butynski, 592 F.3d at 276, we see no substantive error in the challenged instruction.

To the extent that Dr. Shervin sought to prove that she and Dr. Rubash had entered into an agreement in 2005 that she would work at MGH after the completion of her residency in 2008, the court was entitled to tell the jury that such an employment contract would be unenforceable if not in writing. See, e.g.,

Powers v. Bos. Cooper Corp., 926 F.2d 109, 110 (1st Cir. 1991) (applying Massachusetts law); Goodimate, 70 N.E.2d at 416.

We add, moreover, that insofar as Dr. Shervin sought to prove not a contractual relationship but a different species of advantageous business relationship, see, e.g., Leno, 509 N.E.2d at 49, any risk that the statute of frauds instruction would mislead the jury was minimal. The court obviated such a risk by its further instruction that "[a] plaintiff need not show an advantageous business relationship was a contractual relationship," but, rather, an advantageous business relationship may include a "probable prospective business relationship with a third party" from which she had "a reasonable expectation of future economic benefit."

In this instance, all roads lead to Rome. Taking into account the state of the evidence, the charge as a whole, and the applicable standards of review, we conclude that the court below did not abuse its discretion in giving the challenged instruction.

## VI. CONCLUSION

As this case illustrates, there is a certain rough-and-tumble quality to the high-stakes world of academic medicine. Here, however, the jury heard a welter of conflicting evidence presented by able lawyers and determined, after a fundamentally fair trial, that the defendants' conduct — though perhaps

insensitive in some respects — did not cross the border into the forbidden realms of discrimination and retaliation.  In the absence of prejudicial error (and we have found none here), we have no license to substitute our judgment for that of the jurors.[12]

We need go no further.  For the reasons elucidated above, we affirm the judgment entered in the district court.

**Affirmed.**

---

[12] For the sake of completeness, we note that Dr. Shervin also has raised a claim of cumulative error.  Because we have found no reversible error, this claim necessarily fizzles.  See Williams, 146 F.3d at 49 ("Absent any particularized error, there can be no cumulative error.").