# United States Court of Appeals
## For the First Circuit

No. 23-1432

AMY RAE,

Plaintiff, Appellant,

v.

WOBURN PUBLIC SCHOOLS; CITY OF WOBURN; MATTHEW CROWLEY, individually; CARL NELSON, individually,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Montecalvo, Lynch, and Rikelman,
Circuit Judges.

Laurel J. Francoeur, with whom Francoeur Law Office was on brief, for appellant.
Alexandra Milan Gill, with whom Douglas I. Louison and Louison, Costello, Condon & Pfaff, LLP were on brief, for appellees.

August 22, 2024

**MONTECALVO, Circuit Judge.** Plaintiff-appellant Amy Rae is a school nurse who alleged that she was subject to retaliatory harassment while employed by defendant-appellee Woburn Public Schools ("WPS"). Rae specifically maintained that WPS's retaliation stemmed from her advocacy on behalf of students with disabilities and complaints she made to WPS regarding her own mistreatment. Although the alleged retaliation had been ongoing for over a decade, Rae first filed suit against WPS in November 2022 and raised four claims: (1) retaliatory harassment under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"); (2) retaliatory harassment under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA"); (3) employment discrimination in violation of Massachusetts's antidiscrimination statute, Mass. Gen. Laws ch. 151B, § 4 ("Chapter 151B"); and (4) intentional infliction of emotional distress.

On May 5, 2023, the district court dismissed the entirety of Rae's complaint, agreeing with WPS that Rae had failed to state any claims for which relief could be granted. For the reasons explained below, we agree with the district court that Rae cannot rely on the continuing violations doctrine to save her untimely discrimination claims, albeit on different grounds. We also affirm the district court's dismissal of Rae's timely state and federal discrimination claims, but we reach this conclusion for other reasons.

## I. Background

For purposes of summarizing the background underlying Rae's lawsuit against WPS, "we accept the well-pleaded facts as true, viewing factual allegations in the light most favorable" to Rae.[1] Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35 (1st Cir. 2009).

Since 2005, Rae has been a school nurse with WPS and was most recently employed at Kennedy Middle School ("Kennedy"). Rae alleges that defendant-appellee Carl Nelson, the Kennedy Principal, "has a disdain for students with disabilities[,] whom he considers weak and not deserving of special attention or funding." As such, when Rae requested additional resources to assist students with disabilities, she contends that "Nelson began to intimidate her, insisting students with disabilities 'should not be treated any differently than other students' and should not receive accommodations or services related to their conditions."

Beginning in October 2011, Rae expressed concerns that WPS lacked policies for treating students with diabetes and "began advocating for a diabetes policy to be implemented." Meanwhile, Nelson described students with diabetes as "lazy" and denied

---

[1] Rae's complaint organizes her allegations into certain categories of conduct, but it does not include specific dates for many instances of the hostile treatment she allegedly experienced. We make reasonable inferences to discuss the allegations as chronologically as possible, while construing ambiguities in Rae's favor.

accommodations for these students to receive necessary services. Nelson's lack of responsiveness led Rae to elevate her concerns to other WPS administrators; and, in turn, Nelson "started harassing [Rae] in an attempt to discourage her advocacy" by "yell[ing] and demean[ing] her" at work.

Rae also accused Nelson of "conspir[ing] with" her Nurse Leader supervisor, Marcia Skeffington, to "engage[] in a coordinated effort to harass" her. In 2011, when Rae approached Skeffington about WPS's failure to implement policies for students with diabetes and the need for additional support given WPS's "unusually large number of students with diabetes," Skeffington "mocked []Rae and scolded her for 'rocking the boat' by asking for more money." Around the same time, Skeffington informed Nelson that Rae had made a minor "scrivener's error" in a report Rae had prepared. Rae alleges that Skeffington made this frivolous complaint with the ulterior motive of providing Nelson an opportunity to unfairly discipline her. In December 2011, Rae complained about this discipline to her union but did not receive redress.

In 2012, Rae took further action against Nelson and Skeffington's "bullying," including contacting WPS Superintendent Mark Donovan and Rae's union for assistance. In May 2012, Rae's union reached an agreement with WPS administration "to put an end to the bullying" and "avoid litigation," but Donovan did not

execute the agreement.  By August 2012, Rae had hired an attorney to aid in resolving these issues, but Donovan avoided meeting with Rae's attorney "and made promises that were never fulfilled."

Rae alleges that in late 2012 and into 2013, "the bullying got worse," citing an incident where Nelson "thwarted" Rae's attempts to assist a student with diabetes who was refusing to engage in self-care treatment.  Specifically, Nelson filed a child welfare complaint against the student's parents, leading the parents to "verbally attack[]" Rae because they mistakenly believed that she had filed the complaint.  Rather than defending Rae or accepting responsibility, Nelson allowed Rae to be the "'fall guy' for the district's misdeeds."

Similarly, in February 2013, Rae contacted the chair of the special education department at Kennedy to accuse Nelson of violating Section 504 by neglecting to accommodate a student with diabetes.  Nelson was "angered . . . and his harassment intensified" because of Rae's report, and Rae alleges that he took steps to ensure the paraprofessionals with whom she interacted would also "resent[]" and "harass[]" her.

In April 2013, Donovan called a meeting with Rae, Nelson, and Rae's union president after Rae requested that WPS hire a part-time nurse to assist in caring for students with special medical needs.  At that meeting, Donovan "berated and dismissed"

her, and later sent a "reprimanding email . . . in an attempt to silence her from speaking out in the future."

Following this meeting, Rae sought help from her primary care physician, explaining that she was experiencing anxiety, sleeplessness, and depression caused by her work situation. Rae's physician wrote a letter to WPS administration regarding Rae's health issues, but WPS did not take any corrective action.

At some point in 2014, Nelson "purposefully mischaracterized two school-sponsored field trips" as not affiliated with the school to deny accommodations for students with disabilities and to avoid bringing school nurses like Rae on these trips. Nelson also purportedly made "harmful jokes about []Rae, insinuating [that] she was excessively vigilant and rigid about student safety."

In March 2015, Rae documented Nelson's actions on this field trip and other harassment she experienced in a formal complaint filed with her new Nurse Leader supervisor and the union. Despite this complaint, the harassment persisted. Rae continued to raise grievances through her union, and her union representative eventually advised her to transfer out of Kennedy, as "Nelson was engaging in behavior that was designed to rattle her and to make her quit." In October 2015, Rae wrote a letter to her union outlining the harassment she had experienced and requesting a transfer from Kennedy. WPS denied Rae's transfer request.

On July 26, 2016, Rae wrote an email to defendant-appellee Matthew Crowley, the new WPS Superintendent, regarding Kennedy's continued failure to implement a diabetes protocol. Shortly before sending this email, Rae had interviewed for a Nurse Leader promotion for which she was qualified and had seniority, but she was later denied the position.

One month later, on August 25, 2016, Nelson emailed Rae instructing her to report to his office on the first day of school in September 2016 for a disciplinary meeting. Nelson's email did not reference Rae's July 26 email to Crowley or her attempts to transfer, but he instead stated that the meeting was "to discuss a letter that [Rae] sent out to parents using [Nelson's] name." Rae acknowledged sending a letter to fifty-four parents regarding vaccination requirements after Nelson refused to do so, but she insisted that she notified Nelson before sending the letter.

Before the September 2016 disciplinary meeting, Rae corresponded with her union and filed a grievance to note that this discipline was retaliation for her email to Crowley on July 26. On October 7, 2016, Nelson formally disciplined Rae by suspending her without pay for one day of work because she had sent the letter without his permission. Rae contends that Nelson used the letter as a pretext to discipline her for her July 26 email to Crowley, a theory supported by union representatives who called her suspension "not a fair decision" and suggested that

Nelson used "incredibly slimy" tactics to discipline Rae without providing her the opportunity for counsel. A few weeks after her suspension, on October 29, 2016, Rae wrote to Nelson to formally contest the discipline, but Nelson did not respond.

In April 2017, while accompanied by union representatives, Rae met with Crowley to discuss her concerns related to students with diabetes raised in her July 26, 2016 email. Crowley rejected Rae's contentions that WPS had violated Section 504 by failing to accommodate these students and walked out of the meeting. That same month, Rae was involved in developing an individualized education plan ("IEP") for a student with chronic health issues that required Rae to meet with Nelson. During these IEP meetings, Nelson "belittled []Rae in front of the special education staff" when she asked that the IEP incorporate issues related to the student's medical condition. Nelson also "verbally dismissed and berated" Rae when she advocated on behalf of the student who was being bullied because of his condition.

On June 2, 2017, Rae filed a sixteen-page grievance with her union, but the union did not pursue the grievance out of worry that Rae would experience further retaliation from Nelson. Two days after she filed the grievance, "Nelson belittled and berated []Rae in front of a student."

On September 8, 2018, Rae wrote two letters to Joe Demers, a WPS School Committee member, "describing the hostile

work environment" she was experiencing at Kennedy. In December 2018, Demers informed Rae that WPS had newly hired a human resources ("HR") director who would handle Rae's complaints. Rae was skeptical of the new HR director's ability to remedy her situation, so she hired a lawyer in July 2019 to correspond with the school district. But in September 2019, Nelson "continued to attack []Rae" when she was involved in an incident with a sick student and an angry woman who did not have authority to pick up the student from school. A few weeks later, Nelson falsely accused Rae of stealing a sweatshirt she had given to a student.

On November 20, 2019, Rae filed a formal complaint with WPS's new HR department. On the same day, Nelson emailed Rae to meet with her regarding "an alleged parent complaint." Nelson later cancelled the meeting without explanation, but Rae was distressed by the prospect of being disciplined unfairly again.

Soon after, rather than hiring an independent investigator, the HR department appointed WPS's legal counsel to investigate Rae's complaint and permitted Crowley to "tailor[]" the investigation "in [WPS's] favor." WPS also did not allow Rae to testify or present witnesses. And, after several months, Crowley informed Rae that her allegations were unsubstantiated in March 2020. When her complaint was deemed unsubstantiated, Rae and her union requested to meet with the HR department and Crowley regarding the investigation, but WPS declined the meeting.

In June 2021, Rae's union presented Crowley with a "partial resolution" of Rae's complaint that would allow her to avoid reporting to Nelson.  Crowley refused to sign the resolution but agreed that Nelson would no longer conduct Rae's annual reviews.  Despite this, Nelson was listed as Rae's performance reviewer in October 2021.

On April 10, 2022, Rae filed a formal complaint with the Massachusetts Commission Against Discrimination ("MCAD").  One month later, on May 11, 2022, Nelson instructed Rae to report for a disciplinary meeting regarding "a shirt [Rae] let a student borrow."  Nelson provided only vague details about the meeting and did not confirm whether Rae should secure union representation.  During the meeting, Nelson accused Rae of giving a student a shirt that "contained a reference to alcohol," which led a teacher to report the issue to Nelson.  By Rae's account, the student independently took the shirt from the "donation pile" in the nurse's office and Rae did not know that the shirt had inappropriate content.  Rae further explained that other students had worn shirts with alcohol references without incident.  While Rae was not disciplined, Rae's "union president believed the meeting was unnecessary and called it retaliatory," and Rae felt that Nelson intended to "further upset [her] fragile state of mind."

On August 1, 2022, Rae's union president sent a letter to the WPS School Committee on Rae's behalf to point out WPS's failure to "stop the known harassment and retaliation against employees." The WPS School Committee did not respond to the letter and referred the issue to WPS's legal counsel. Approximately two months later, on September 28, 2022, another incident occurred when Rae left her office to use her inhaler in her car while a student was waiting to check his blood sugar levels. The student was not experiencing a medical emergency, and another administrator was able to fully assist him while Rae was away. Although Rae left notes on her office door and desk to indicate that she would return shortly, Nelson "paged []Rae seven times using the school's internal public address system, which []Rae could not hear because she was locked outside the building."

When Rae returned, Nelson immediately "berated" her for missing the pages, and Rae construed Nelson's excessive paging as an attempt to publicly embarrass her. One hour later, Nelson notified Rae that he was initiating disciplinary proceedings and advised her to obtain union representation. During the disciplinary meeting on October 5, 2022, Nelson "scolded" Rae for briefly leaving school, repeatedly demanded that she justify her absence, and interrupted her as she tried to explain the circumstances. Nelson also read aloud a "confidential email" Rae

- 11 -

sent to him disclosing "her medical issue and the severe emotional distress his actions had caused her."

On November 17, 2022, Rae filed suit against WPS, claiming that WPS employees had engaged in retaliatory harassment in violation of state and federal law, and that WPS's conduct constituted intentional infliction of emotional distress. WPS moved to dismiss the entirety of Rae's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) on December 12, 2022. The district court granted WPS's motion to dismiss on May 5, 2023, agreeing with WPS that Rae had failed to plausibly demonstrate her entitlement to relief on any claim. Rae then filed this timely appeal challenging the dismissal of only her ADA, Section 504, and Chapter 151B claims.

## II. Discussion

This court reviews de novo a district court's dismissal of a plaintiff's complaint under Rule 12(b)(6). Rodríguez-Vives v. P.R. Firefighters Corps of P.R., 743 F.3d 278, 283 (1st Cir. 2014).

To assess whether a complaint can withstand a Rule 12(b)(6) motion, we "must accept as true all well-pleaded facts 'indulging all reasonable inferences in [Appellant's] favor.'" Fantini v. Salem State Coll., 557 F.3d 22, 26 (1st Cir. 2009) (alteration in original) (quoting Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006)). Our federal pleading standard "requires

- 12 -

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Accordingly, we "will not accept a complainant's unsupported conclusions or interpretations of law." Wash. Legal Found. v. Mass. Bar Found., 993 F.2d 962, 971 (1st Cir. 1993). But "[b]ecause a dismissal terminates an action at the earliest stages of litigation without a developed factual basis for decision, we must carefully balance the rule of simplified civil pleading against our need for more than conclusory allegations." Id.

Rae points to three main errors in the district court's decision dismissing her complaint. First, Rae contends that the district court wrongly held that the continuing violations doctrine did not apply to her retaliatory harassment claims. Second, she insists that the district court made factual determinations that are inappropriate at the motion to dismiss phase. Third, and relatedly, Rae argues that the district court improperly required her to satisfy the more stringent requirements of a prima facie case of retaliatory harassment instead of the relaxed plausibility pleading standard.

We begin by laying some foundation on the timeliness of Rae's claims, the elements of a retaliation claim, and the intertwined issues of accrual of employment discrimination claims and the continuing violations doctrine. We then take Rae's

arguments in turn and explain why Rae cannot rely on the continuing violations doctrine to save her untimely accrued claims. Lastly, we conclude that the district court correctly dismissed Rae's timely ADA, Section 504, and Chapter 151B claims.

## A. Timeliness of Rae's Claims

Rae alleges that, over an eleven-year span, she engaged in multiple protected activities and, as a direct result of her protected activities, she suffered various forms of retaliation. But she did not begin the process of filing suit by initiating MCAD proceedings until April 10, 2022. We briefly highlight the administrative filing requirements as they relate to the timeliness of Rae's claims and clarify the operative statutes of limitations.

For employment discrimination claims arising under Chapter 151B, plaintiffs must file administrative charges before going to court.[2] Dunn v. Langevin, 211 N.E.3d 1059, 1062 (Mass. 2023). In particular, Chapter 151B requires plaintiffs to file charges with MCAD within 300 days of experiencing the adverse action alleged. Mass. Gen. Laws ch. 151B, § 5.

_____

[2] Section 504 "does not require [administrative] exhaustion" because the Rehabilitation Act "derives its procedural requirements from Title VI, which does not have an exhaustion requirement." Brennan v. King, 139 F.3d 258, 268 n.12 (1st Cir. 1998). Title II of the ADA incorporates by reference the procedural provisions of Section 504, meaning it likewise does not include an administrative exhaustion requirement. See 42 U.S.C. § 12133.

Chapter 151B does not mandate that a plaintiff await receipt of a right-to-sue letter from MCAD or completion of the MCAD investigation before they file suit. A plaintiff may proceed to court if they have not received a response from MCAD after ninety days of filing their MCAD charge. Id. §§ 5, 9. In all events, a Chapter 151B claim must be filed in court within three years of the adverse employment action. Id. § 9.

Here, it is unclear whether Rae obtained a right-to-sue letter from MCAD before initiating the present case, what claims she included in her administrative charge before MCAD, and whether she amended her MCAD charge to include conduct that occurred after she initially filed her charge in April 2022. Because WPS has not challenged Rae's compliance with any administrative exhaustion requirements and we may consider events that "occurred after the plaintiff's filing of her MCAD complaint" in the interest of judicial efficiency, Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d 928, 935 n.8 (Mass. 2001), any potential administrative exhaustion arguments that WPS could have raised are waived.

As to the time periods for potentially actionable conduct, the district court applied a three-year limitations period to Rae's ADA and Section 504 claims. Accordingly, it assessed whether events that occurred after November 17, 2019 -- three years prior to the filing of Rae's civil suit on November 17, 2022 -- could be actionable for Rae's federal claims.

- 15 -

In determining that Rae's federal claims were subject to a three-year statute of limitations period, the district court impliedly made two key assumptions. First, the district court seemed to assume that Title II of the ADA was applicable to Rae's ADA claim. Cf. Barker v. Riverside Cnty. Off. of Educ., 584 F.3d 821, 827-28 (9th Cir. 2009) (holding that the plaintiff had standing to sue under Title II of the ADA for the retaliation she experienced after "opposing her school's special education policies that allegedly violated the ADA"). Second, because Title II of the ADA and Section 504 do not incorporate their own statutes of limitations,[3] the district court defaulted to a three-year limitations period borrowed from the forum state's statute of limitations for Chapter 151B claims. See Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 118 (1st Cir. 2003).

For Rae's Chapter 151B claim, the district court relied on the 300-day limitations period contained in Chapter 151B, § 5. As such, the district court evaluated whether events after June 14, 2021 -- 300 days before Rae filed her MCAD charge on April 10, 2022 -- constituted actionable conduct under Chapter 151B. Neither party challenges the district court's reliance on a three-year statute of limitations for Rae's federal claims and the 300-day

_____

[3] Both statutes were also enacted before 28 U.S.C. § 1658 -- the statute providing a catch-all four-year statute of limitations for federal laws enacted after December 1, 1990. See Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 371 (2004).

- 16 -

period for Rae's Chapter 151B claim. We agree that the district court's underlying assumptions were reasonable and adopt the same limitations periods for our review. Having confirmed the pertinent time frames for assessing actionable conduct under these statutes, we proceed to outlining the elements of a retaliatory harassment claim.

## B. Elements of Retaliatory Harassment

Retaliation claims under the ADA, Section 504, and Chapter 151B are analyzed under the same three-element framework: (1) the plaintiff engaged in protected conduct; (2) the plaintiff experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action. See Quiles-Quiles v. Henderson, 439 F.3d 1, 8 (1st Cir. 2006) (elements of retaliation under Section 504); Colón-Fontánez v. Mun. of San Juan, 660 F.3d 17, 36 (1st Cir. 2011) (elements of retaliation under the ADA); Sullivan v. Raytheon Co., 262 F.3d 41, 48 (1st Cir. 2001) (elements of retaliation under Chapter 151B). With these basic elements in mind, we walk through the particulars of each one.

First, beginning with the protected activity element, advocating on behalf of people with disabilities -- including protecting students' right "to be free from disability-based discrimination" -- "plainly constitutes protected conduct" under the ADA and Section 504. D.B. ex rel. Elizabeth B. v. Esposito,

- 17 -

675 F.3d 26, 41 (1st Cir. 2012) (collecting cases).  While it does not appear that the Massachusetts Supreme Judicial Court ("SJC") has addressed advocacy on behalf of people with disabilities as protected conduct under Chapter 151B, the statute contains a broad anti-retaliation clause that generally parallels federal protections.  See Mass. Gen. Laws ch. 151B, § 4(4); see also Murray v. Warren Pumps, LLC, 821 F.3d 77, 87 (1st Cir. 2016) (treating Chapter 151B's anti-retaliation provision as an "analog" to the ADA's anti-retaliation provision and analyzing identical elements under both laws).

In addition, reporting discriminatory conduct to the employer's HR department or an administrative agency like MCAD constitutes protected activity.  See Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 223 (1st Cir. 2007); Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 220 (1st Cir. 2016); Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 50 N.E.3d 778, 802 (Mass. 2016).  Short of raising formal complaints, "informally opposing an employment activity that might violate" antidiscrimination statutes "broadly" captures other types of protected activity.  Ray v. Ropes & Gray LLP, 799 F.3d 99, 108 (1st Cir. 2015) ("Protected opposition activity includes responding to an employer's inquiries about inappropriate behavior, writing letters protesting an employer's allegedly unlawful actions, or picketing and boycotting an employer.").

WPS does not contest that Rae's advocacy on behalf of students with disabilities constitutes protected activity under all three statutes, and the district court "assum[ed] without deciding that advocacy on behalf of such students is protected conduct." On the other hand, WPS insists that Rae's complaints regarding the alleged hostile work environment were made "on her own behalf," and thus do not constitute protected conduct. In WPS's view, because Rae relies on her student-oriented advocacy as the primary form of protected activity, her retaliation claims must solely center around adverse action stemming from such advocacy. But this argument ignores the obvious fact that retaliation is a forbidden practice under all three statutes, and thus, complaining about retaliation is itself protected conduct. Cf. Alvarado v. Donahoe, 687 F.3d 453, 463 (1st Cir. 2012) ("[F]ederal anti-retaliation provisions generally prohibit conduct taken in retaliation for any protected activity, not just a plaintiff's initial protected action."). As will become clear, we assume that Rae's complaint plausibly alleged that she engaged in several protected activities between 2011 and 2022 -- not limited to her advocacy on behalf of students with disabilities.

Second, "[a]n adverse action is one that might well dissuade a reasonable person from making or supporting a charge of discrimination." D.B., 675 F.3d at 41; see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). In general,

- 19 -

"'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees' may constitute adverse employment action, subject to the facts of a particular case." Colón-Fontánez, 660 F.3d at 37 (quoting Hernández-Torres v. Intercont'l Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998)). Of particular relevance here, "a hostile work environment, tolerated by the employer, is cognizable as a retaliatory adverse employment action" if the harassment is "sufficiently severe or pervasive." Noviello v. City of Boston, 398 F.3d 76, 89 (1st Cir. 2005).

Although Rae's complaint alleges multiple adverse actions -- including unwarranted discipline, refusal to transfer, denial of promotion, and a hostile work environment -- the district court largely focused on whether Rae plausibly alleged that the harassment she suffered constituted a hostile work environment. Moreover, the district court held that Rae could not invoke the continuing violations doctrine to rely on allegations of conduct outside of the 300-day period for her Chapter 151B claim or the three-year window for her federal claims to plausibly establish a hostile work environment. And it noted that it was "skeptical" that Rae's timely allegations from within these respective time frames could constitute severe or pervasive harassment.

Lastly, a retaliation claim under all three statutes requires a plaintiff to demonstrate that their protected activity

- 20 -

was the but-for cause of the adverse action they suffered. Palmquist v. Shinseki, 689 F.3d 66, 74 (1st Cir. 2012); Edwards v. Commonwealth, 174 N.E.3d 1153, 1168 (Mass. 2021). "One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action." Wyatt v. City of Boston, 35 F.3d 13, 16 (1st Cir. 1994). Moreover, "harassment itself" may "offer[] circumstantial evidence of causation." Noviello, 398 F.3d at 86. Relying solely on conduct from within the 300-day and three-year time frames, the district court held that Rae's complaint failed to plausibly demonstrate that her protected activity was the but-for cause of the adverse action.

Here, the appropriate time period for actionable conduct is closely linked to the adverse action and causation elements of Rae's retaliatory harassment claim. But before returning to the complications surrounding these two elements, we detour to discuss two key issues underlying Rae's appeal: the accrual of employment discrimination claims and the continuing violations doctrine.

## C. Accrual of Employment Discrimination Claims and the Continuing Violations Doctrine

The date on which an employment discrimination claim accrues dictates the start of the limitations period for filing an administrative charge. Thomas v. Eastman Kodak Co., 183 F.3d 38, 48 (1st Cir. 1999). In simplest terms, "an employer action only

triggers the running of the statute of limitations" -- indicating that an employment discrimination claim has accrued -- "if that action has concrete, negative consequences for an employee, and the employee is aware or should have been aware of those consequences." Id. at 49.

The continuing violations doctrine intersects with the accrual of employment discrimination claims, but it presents somewhat different inquiries. In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court addressed the questions of "[w]hat constitutes an 'unlawful employment practice' and when . . . that practice [has] 'occurred'" under Title VII "for both discrete discriminatory acts and hostile work environment claims." Id. at 110. As examples of discrete acts, the Court listed adverse employment actions "such as termination, failure to promote, denial of transfer, or refusal to hire." Id. at 114. The Court then emphasized that "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" Id. Moreover, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges," and "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." Id. at 113.

But the Court made clear that "[h]ostile environment claims are different in kind from discrete acts" because "[t]heir

very nature involves repeated conduct." Id. at 115. Consequently, the existence of a hostile work environment -- as a unique type of adverse employment action -- "cannot be said to occur on any particular day." Id. Instead, a hostile work environment "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Id. The Court thus held that, under the continuing violations doctrine, "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." Id. at 122. Importantly, the Court rejected the practice of some circuits, including ours, that limited application of the continuing violations doctrine to circumstances where "it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct." Id. at 117–18.

But the Morgan Court ultimately "left open" the question of "identifying the date on which a Title VII claim accrues." Miller v. N.H. Dep't of Corr., 296 F.3d 18, 22 (1st Cir. 2002). Our case law, however, provides that a retaliation claim accrues as a discrete act of discrimination "when it has a crystallized and tangible effect on the employee and the employee has notice of both the act and its invidious etiology." Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 34 (1st Cir. 2015).

## D. Time-Barred Discrete Acts of Retaliation

## 1. Rae's Invocation of the Continuing Violations Doctrine

Here, Rae attempts to amalgamate a series of discrete acts of retaliation into one sweeping retaliatory harassment claim to invoke the continuing violations doctrine. But the continuing violations analysis requires disaggregating each discrete act of alleged retaliation before assessing whether the continuing violations doctrine is applicable. After engaging in this disaggregation (and for different reasons than the district court), we hold that Rae cannot rely on the continuing violations doctrine to rescue her time-barred claims.[4]

---

[4] In addition, as Rae points out, in determining that the continuing violations doctrine could not be applied to Rae's retaliatory harassment claims under both state and federal law, the district court relied solely on cases interpreting the continuing violations doctrine under Massachusetts law. This was incorrect, as the Massachusetts standard is meaningfully different from the federal standard on continuing violations.

The SJC has adopted the pre-Morgan standard for the continuing violations doctrine for Chapter 151B claims. Under Massachusetts law, "a continuing violation claim will fail if the plaintiff was, or should have been, aware that she was being unlawfully discriminated against while the earlier acts, now untimely, were taking place." Cuddyer, 750 N.E.2d at 938. The Morgan Court, however, declined to impose a lack-of-knowledge or reasonableness requirement for the federal continuing violations doctrine. 536 U.S. at 117-18 ("It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some of the Circuits, that the plaintiff may not [rely on the continuing violations doctrine] unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct."); see also Marrero v.

Where "discre[te] acts of alleged retaliation fall outside the filing period," such "acts are time[-]barred." Dressler v. Daniel, 315 F.3d 75, 79 (1st Cir. 2003). The Morgan Court made clear that "each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" 536 U.S. at 114. And if "prior discrete discriminatory acts are untimely filed," they are "no longer actionable." Id. at 115. The continuing violations doctrine does not alter this rule. Nor does framing discrete claims as non-discrete components of a single retaliatory harassment claim -- especially where, as in Rae's case, such a "claim" spans eleven years -- entitle the plaintiff to invoke the continuing violations doctrine.

Put differently, the continuing violations doctrine indisputably serves as "an equitable means of ensuring that meritorious discrimination claims are not pretermitted because the

---

Goya of P.R., Inc., 304 F.3d 7, 18 (1st Cir. 2002) (recognizing that "the Supreme Court [in Morgan] explicitly rejected the view -- advanced by [the employer] here -- that 'the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct'" (quoting Morgan, 536 U.S. at 117-18)). Moreover, post-Morgan, the SJC has commented that the Massachusetts standard is "phrased differently" than the version approved in Morgan, and as is permissible, it has continued applying the lack-of-knowledge requirement for continuing violations alleged under Chapter 151B. Clifton v. Mass. Bay Transp. Auth., 839 N.E.2d 314, 320 n.8 (Mass. 2005).

claimant needed to experience a pattern of repeated acts before [they] could be expected to realize that the individual acts were discriminatory in nature." Loubriel v. Fondo del Seguro del Estado, 694 F.3d 139, 144 (1st Cir. 2012). But "related discrete acts" cannot be combined "into a single unlawful practice for the purposes of timely filing." Morgan, 536 U.S. at 111. In fact, the Morgan Court reversed the Ninth Circuit's approach to "appl[ying] the continuing violations doctrine to what it termed 'serial violations.'" Id. at 114. Even where "one [discrete] act falls within the charge filing period," the Court held that the continuing violations doctrine could not be applied to allow "discriminatory and retaliatory acts that are plausibly or sufficiently related to that [timely] act [to] also be considered for the purposes of liability." Id.; see also Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 33 (1st Cir. 2009) ("As to serial violations, the Supreme Court has reiterated that 'discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'" (quoting Morgan, 536 U.S. at 113)).

In her reply, Rae is adamant that she "is not suing for discrete acts of retaliation" because she has brought "a hostile work environment claim that is comprised of a long pattern of retaliatory behavior stemming from the same animus." Rae's argument elides two important issues. First, we have never held

that a plaintiff's allegations of retaliatory harassment eliminate our obligation to evaluate whether the allegations include discrete discriminatory acts that are time barred. Retaliation can take many forms and harassment is just one type of retaliation. See Marrero, 304 F.3d at 26; Noviello, 398 F.3d at 87 ("[R]etaliation is a distinct and independent act of discrimination, motivated by a discrete intention to punish a person who has rocked the boat by complaining about an unlawful employment practice.").

As already noted, the Morgan Court contemplated that "each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'" with its own statute of limitations period. 536 U.S. at 114. Accordingly, we have held that "[u]nder both federal and state law, a cause of action for discrimination or retaliation accrues when it has a crystallized and tangible effect on the employee and the employee has notice of both the act and its invidious etiology." Shervin, 804 F.3d at 33 (emphasis added). So, even where a plaintiff alleges a pattern of retaliatory conduct (here, in the form of a hostile work environment), discrete retaliation claims can still accrue and may become time barred.

Second, while Rae views the harassment she suffered as being driven by generalized retaliatory motives, the continuing violations doctrine requires more. "[I]n order to invoke [the

- 27 -

continuing violations] doctrine, a claimant must show at a bare minimum a series of discriminatory acts that emanate from the same discriminatory animus." Noviello, 398 F.3d at 87 (emphasis added). Here, Rae's complaint reflects that she engaged in several types of protected activities for different purposes over an eleven-year period. And at a high level, Rae's advocacy on behalf of students with disabilities beginning in 2011 can be construed as the catalyst for this extensive series of retaliation-related events. But the disparate forms of Rae's protected activities, which were taken for varying purposes for over a decade, make it necessary to determine whether WPS's numerous adverse actions stemmed from the same animus.[5]

Consequently, raising a retaliatory harassment claim alone does not automatically entitle a plaintiff to rely on the continuing violations doctrine. In particular, a plaintiff may not disguise discrete acts of retaliation as a single retaliatory harassment claim comprised of temporally distant conduct, multiple

_____

[5] Of course, where a plaintiff alleges that they suffered harassment because of a protected trait such as race or sex, establishing that the employer's conduct was motivated by the same discriminatory animus -- even if the harassment occurred over a very long timespan -- can be a more feasible task. Cf. Morgan, 536 U.S. at 120 (applying continuing violations doctrine where "managers made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of [Black employees] to be supervisors, and used various racial epithets" and holding that this misconduct was clearly driven by the same discriminatory animus).

forms of protected activity undertaken for various purposes, and several discrete adverse actions. Under other circumstances, however, a plaintiff alleging retaliatory harassment may be able to rely on the continuing violations doctrine. Likewise, we do not foreclose applying the continuing violations doctrine to "a claim involv[ing] a pattern of conduct which includes a discrete act that may itself be actionable," with the caveat that "the continuing violation doctrine is arguably more accommodating under Massachusetts law than under federal law" in such cases. Shervin, 804 F.3d at 37 n.7. But as cataloged in detail below, Rae's complaint alleges a series of discrete retaliation claims that cannot be saved by the continuing violations doctrine.

## 2. Serial Discrete Acts of Retaliation Are Time Barred

Rae alleges that she first engaged in protected activity by advocating for students with disabilities in October 2011. And soon thereafter, Nelson "began to intimidate her" through harassing behavior. Furthermore, Nelson "conspired" with Rae's co-worker to punish Rae for her advocacy and tolerated this co-worker harassment. By December 2011, Rae had suffered "unfounded discipline" that she maintains was a result of Nelson's "coordinated effort to harass [her]." "[A] reprimand may constitute an adverse action," Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 73 (1st Cir. 2011), and severe or pervasive harassment "by co-workers or supervisors" is also adverse action, Marrero,

- 29 -

304 F.3d at 26. But somewhat paradoxically, in the light most favorable to Rae, we assume she did not intend to plead that these acts were sufficient to satisfy the adverse action element of her retaliation claim, which would have triggered the earliest possible statute of limitations on a retaliation claim.

Even so, by approximately December 2012, Rae alleges that she "feared further retaliation" after she hired an attorney to negotiate with WPS, was unsuccessful in resolving the alleged harassment through her attorney, and experienced "extreme distress" when she was "used as a 'fall guy'" for Nelson's misconduct. At this point, by Rae's own acknowledgement, Rae's retaliation claim stemming from her October 2011 advocacy[6] had accrued. See Miller, 296 F.3d at 22 (holding that the plaintiff's retaliation claim accrued where he explicitly noted that he felt "abused and retaliated against"); Shervin, 804 F.3d at 33 (explaining that the plaintiff's "knowledge of the probation and its immediate, tangible effects, together with her loudly bruited belief that the probation decision was a form of disparate discipline motivated by gender discrimination, is all that was

---

[6] We note without deciding that, in this same time period, Rae engaged in other activities that could constitute protected conduct, such as hiring a lawyer to challenge the retaliatory harassment she perceived. See Kinzer v. Whole Foods Mkt., Inc., 99 F.4th 105, 115 (1st Cir. 2024) (emphasizing that protected conduct is construed "broadly" and can include a wide array of activities).

needed for her cause of action to accrue and the limitations clock to begin to tick"). Under Morgan, by failing to file administrative charges and a lawsuit to recover on this completed, discrete act of retaliation, Rae has forfeited her right to recover on it. See 536 U.S. at 113.

Likewise, Rae engaged in multiple forms of protected activity between February 2013 and October 2015, including advocating for students with disabilities and filing at least two formal complaints that raised concerns about WPS's treatment of students with disabilities and the harassment she was suffering. Rae documented numerous ways in which Nelson's harassment negatively "interfer[ed]" with her job duties and work environment, caused her emotional distress, and left her feeling compelled to request a transfer to escape Nelson's supervision. At some point after October 2015, WPS denied Rae's request to transfer. And WPS later refused to promote Rae to a Nurse Leader position for which she had seniority and was qualified in the summer of 2016.

After being denied the transfer and promotion -- which plainly constituted adverse employment actions -- Rae continued to engage in protected activities and WPS repeatedly took adverse action against her. And by our count, Rae's complaint alleges at least two additional completed, discrete acts of retaliation between mid-2016 and late-2019.

- 31 -

For instance, on July 26, 2016, Rae "filed an official complaint" with Crowley, her Nurse Leader supervisor, and other WPS staff regarding WPS's failure to implement an appropriate diabetes protocol. One month later, under what Rae perceived to be improper pretenses, Nelson initiated disciplinary proceedings against her. As a result, Rae was formally suspended without pay, which she explicitly described as "an act of retaliation against [her]" for sending her July 26 email calling out WPS's failure "to comply with state and federal laws that protect the civil rights of students with disabilities, and [Nelson's] ongoing attempts to intimidate [her] in order to silence [her] from coming forward." Most generously to Rae, WPS's latest (and indisputably adverse) act of imposing a pretextual suspension -- based on what Rae herself believed were retaliatory motives -- triggered the running of a statute of limitations on a second retaliation claim in October 2016. Again, Rae did not file timely charges or a civil suit to recover on this discrete retaliation claim.

Next, between April and June 2017, Rae engaged in several forms of protected conduct. In April 2017, Rae complained to Crowley regarding WPS's "failure to fund nursing services for diabetic students" and insisted that "these students were being denied a free and appropriate public education" in violation of federal law. Around the same time, Rae participated in drafting an IEP on behalf of a student with disabilities and urged Nelson

to adopt specific accommodations to prevent the student from being bullied. And in June 2017, Rae filed a grievance with her union to complain about her mistreatment.

All the while, and well into 2018, Nelson continued to "belittle[] and berate[]" Rae at work, causing Rae even greater "emotional distress." For example, during meetings regarding the student's IEP, Nelson "belittled []Rae in front of the special education staff" and "verbally dismissed and berated" her when she brought up concerns about the student being bullied.

On September 8, 2018, Rae wrote to a WPS School Committee member "describing the hostile work environment" she perceived. By this point in 2018, another retaliation claim accrued, but Rae did not act on it. See Dressler, 315 F.3d at 79 (describing a discrete retaliation claim as time barred where the plaintiff "perceived a hostile work environment" but did not file timely administrative charges).

In July 2019, Rae reengaged counsel to address her concerns with WPS. Approximately two months later, in September 2019, Nelson allowed a woman who was not authorized to pick up a sick student to verbally abuse Rae, and he also "[b]erat[ed] and embarrass[ed]" Rae. Then, a few weeks later, Nelson "falsely accused" Rae of stealing a sweatshirt that she had given to a student, again causing Rae "great distress." Rae took this

incident to be "another attempt [by Nelson] to embarrass and harass" her.

On November 20, 2019, Rae filed a formal complaint with the WPS HR department, citing several examples of "bullying and retaliation" that she classified as "retaliation for [her] recent reports of unfair and unlawful conduct" that "substantially disrupt[ed] [her] work as a school nurse and ma[d]e [her] feel afraid and unsafe." From Rae's own account, Nelson's retaliatory behavior in response to her protected activity led her to believe that she was suffering from a hostile work environment. While Rae's November 2019 HR complaint was based on Nelson's more "recent" conduct, Rae explicitly noted that she was suffering from a hostile work environment since at least fall 2018. Consequently, as previously discussed, Rae cannot avoid the conclusion that a time-barred retaliatory harassment claim accrued by late 2018.

For largely the same reasons discussed above, the continuing violations doctrine cannot be applied to Rae's Chapter 151B claims. Under Massachusetts law, a plaintiff cannot invoke the continuing violations doctrine where "the employer's actions (or inactions) were sufficient either to make the [plaintiff] aware of the discrimination, or to enable [them] to form a reasonable belief thereof." Ocean Spray Cranberries, Inc. v. Mass. Comm'n Against Discrimination, 808 N.E.2d 257, 269 (Mass. 2004).

- 34 -

Rae contends that the district court wrongly "speculate[d]" about her "state of mind" when it concluded that she "knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve." But Rae's pleadings repeatedly highlight her belief that she was the victim of retaliatory harassment. Rae explicitly described her suspension without pay in October 2016 as "an act of retaliation against [her]." And in September 2018, citing the unlawfulness of retaliatory harassment under Massachusetts law, Rae wrote that she wanted to present "evidence . . . to address the wide spread [sic] retaliation that occurred against [her] that warranted legal action." Consequently, the district court did not need to "speculate" about Rae's mindset when Rae, in her own words, made clear that she believed she was suffering from discrimination. And the district court correctly concluded that Rae could not invoke the continuing violations doctrine under Massachusetts law.

## E. Actionable Conduct for Rae's ADA, Section 504, and Chapter 151B Claims

This brings us to the window for actionable conduct under Title II of the ADA and Section 504's three-year statute of limitations, beginning on November 17, 2019.

The district court considered Rae's advocacy on behalf of students with disabilities as the sole protected activity for any timely retaliation claim. It then "assume[d] without deciding"

that Rae had suffered adverse action within the three-year time frame. But the district court dismissed Rae's retaliation claim after concluding there was no causal connection between the adverse action and Rae's advocacy on behalf of students with disabilities. Likewise, for Rae's Chapter 151B claim, the district court held that Rae had failed to demonstrate "a causal connection between the timely allegations of adverse action and any protected activity."[7]

At times, Rae's complaint alleges that her advocacy on behalf of students with disabilities was the sole cause of appellees' retaliatory conduct. But at other points, Rae suggests that other forms of protected activity motivated appellees' retaliation. Taking the allegations of the complaint in the light most favorable to Rae, as we must, and in line with our prior discussion, we conclude that her complaint alleges several distinct forms of protected activity within an eleven-year span.

For instance, Rae alleges that on or about November 20, 2019, she engaged in protected activity by filing a complaint with the WPS HR department regarding Nelson's retaliatory harassment.

---

[7] The district court appears to have construed Rae's complaint as alleging a separate hostile work environment claim under Chapter 151B. Regardless of whether Rae intended to raise a standalone hostile work environment claim, the district court correctly relied on the same "severe or pervasive" harassment standard applicable to the adverse employment action element of a retaliatory harassment claim. See Noviello, 398 F.3d at 89.

Rae alleges that, on the same day, Nelson "retaliated and intimidated her" by ordering her to report for a disciplinary hearing that he later cancelled without reason.

Although this incident may have been quite close in time to Rae's protected activity, it is not clear from Rae's complaint or supporting documentation when she filed her HR complaint or whether Nelson was actually seeking to discipline her.[8] Relatedly, Rae does not allege whether or how Nelson would have known about her HR complaint before he sent the email; she merely noted, in a separate email sent on November 20, 2019, to a third party that "perhaps [Nelson] heard [she was] going to a scheduled Human Resources meeting today." Moreover, Nelson's email does not appear to reference disciplinary proceedings at all -- it simply requests that Rae "stop by at the beginning of 6th period to discuss an email [he] received from a parent." Rae apparently took this to mean that she was being disciplined, and she noted in her response to Nelson that she would be requesting union representation.

Rae maintains that Nelson's unexplained cancellation evinces his malintent. But her failure to plausibly allege the exact timing of events and Nelson's purported knowledge of her

_____

[8] Rae alleges that she filed her HR complaint "[o]n or about November 20, 2019." The corresponding exhibit is addressed to the HR department and dated November 20, 2019, but it is not an email or other document with an automatic timestamp. Meanwhile, Rae attached Nelson's email from November 20, 2019, showing 9:42am as the sent time.

protected activity make it impossible to evaluate this conclusory allegation. So, while we make all reasonable inferences in Rae's favor, we cannot do so on this key causation issue, and must conclude that Nelson's email alone does not constitute retaliatory conduct.

Rae then appears to allege that WPS conducted a "sham investigation" of her HR complaint and the investigator later "demean[ed]" her when she "requested a meeting about the shoddy and biased investigation" in June 2020. We agree with the district court that these allegations do not plausibly establish that Rae suffered an adverse employment action. Similarly, Rae alleges that in October 2021, Nelson purportedly violated an agreement with Rae's union prohibiting him from conducting her annual performance reviews. But she does not suggest that these reviews were unwarrantedly negative or otherwise affected her working conditions. Nonetheless, as events that underly her timely retaliatory harassment claim, we do not wholly cast them aside yet.

Problematically, however, Rae does not allege that WPS engaged in any other misconduct in the two-year span following her protected activity in November 2019. Indeed, even by the start of the time frame for her Chapter 151B claims beginning on June 14, 2021, Rae does not allege that she engaged in any protected activity or suffered any adverse action. Although we can infer

that Rae's work at WPS was substantially altered due to COVID-19, these sparse allegations do not make out a retaliatory harassment claim based on her protected activity of filing the HR complaint in November 2019.

Regardless, Rae engaged in additional protected activity on April 10, 2022 by filing her MCAD complaint, naming Crowley and Nelson "as the persons responsible for the retaliation" she experienced. One month later, on May 11, 2022, Rae alleged that Nelson "summoned [her] to a disciplinary hearing" regarding a t-shirt containing a reference to alcohol that a student had taken from a donation pile without Rae's knowledge. Although Rae was not formally disciplined, she maintained that the meeting was unjustified and retaliatory.

The next retaliatory event that Rae alleges occurred on September 28, 2022, where Nelson repeatedly paged her over the public announcement system while she was locked out of the building after leaving briefly to use her inhaler. One week later, Nelson held a disciplinary hearing to address Rae's unauthorized absence. While Rae does not indicate whether WPS took disciplinary action, she claims that Nelson's pretextual discipline caused her "severe emotional distress" and "humiliation."

The district court suggested that, based on the limited number of timely retaliatory acts alleged, the harassment was likely not severe or pervasive enough to constitute retaliatory

harassment.  Alternatively, it held that Rae's allegations of timely events "do not establish a causal link between her protected activity on behalf of [students with disabilities] and the claimed harassment."

Even if, as Rae contends, the district court erred in holding that she failed to sufficiently plead causation, we nonetheless affirm on grounds that Rae has not plausibly alleged that she suffered severe or pervasive harassment.  As already noted, Rae engaged in protected activity other than her advocacy on behalf of students with disabilities, including filing her MCAD complaint in April 2022.  So, construing the allegations in the light most favorable to Rae, the district court should have assessed whether she had plausibly alleged that her more recent protected activity of filing her MCAD complaint was the but-for cause of the retaliatory conduct she suffered.

In this vein, we have cautioned district courts against "treat[ing] the prima facie case, 'a flexible evidentiary standard,' as a 'rigid pleading standard,' requiring [the plaintiff] to establish each prong of the prima facie case to survive a motion to dismiss." Garayalde-Rijos v. Mun. of Carolina, 747 F.3d 15, 24 (1st Cir. 2014) (citation omitted) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)).  Rather, "[t]he question at this stage of the case is not 'the likelihood that a causal connection will prove out as fact.'" Román-Oliveras

v. <u>P.R. Elec. Power Auth.</u>, 655 F.3d 43, 50 (1st Cir. 2011) (quoting <u>Sepúlveda-Villarini</u> v. <u>Dep't of Educ. of P.R.</u>, 628 F.3d 25, 30 (1st Cir. 2010)). And of course, "[n]one of this is to deny the wisdom of the old maxim that after the fact does not necessarily mean caused by the fact." <u>Sepúlveda-Villarini</u>, 628 F.3d at 30. But even though "it is possible that other, undisclosed facts may explain the sequence better[,] [s]uch a possibility does not negate plausibility, however; it is simply a reminder that plausibility of allegations may not be matched by adequacy of evidence." <u>Id.</u>

Moreover, despite Rae's inability to rely on the continuing violations doctrine to rescue her time-barred claims, "evidence of events that fall outside the statute of limitations may still be admitted as relevant background evidence to show that discriminatory animus motivated the acts that occurred within the statute of limitations." <u>Malone</u> v. <u>Lockheed Martin Corp.</u>, 610 F.3d 16, 22 (1st Cir. 2010); <u>see also</u> <u>Morgan</u>, 536 U.S. at 113 (explaining that, even where discrete acts are time barred, a plaintiff may still "us[e] the prior acts as background evidence in support of a timely claim"); <u>Pelletier</u> v. <u>Town of Somerset</u>, 939 N.E.2d 717, 731 n.33 (Mass. 2010) ("If the plaintiff does not meet the continuing violation standard, the plaintiff may still use events that occurred prior to the [Chapter 151B] limitation period as background evidence of [a] hostile work environment, but may not recover damages for time-barred events.").

A district court errs where it "fail[s] to evaluate the cumulative effect of the factual allegations." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011). Here, accepting all of the allegations as true, Rae's complaint plausibly spelled out an acrimonious history of retaliatory conduct based on her advocacy on behalf of students with disabilities and her opposition to the retaliation she perceived. In particular, Rae's complaint suggests that her protests centering around Nelson's inappropriate behavior -- whether towards her or students with disabilities -- led Nelson to target her for retaliatory treatment. While additional evidence may undermine Rae's ability to succeed on the merits, the district court erred by "demand[ing] more than plausibility" at the pleadings phase. Sepúlveda-Villarini, 628 F.3d at 29. Taken as a whole, Rae's complaint sufficiently suggested that the timely adverse actions alleged were undertaken with retaliatory motives, such that her retaliatory harassment claims should not have been dismissed for failure to sufficiently plead causation.

But Rae falters when it comes to alleging that the harassment she experienced after filing her MCAD complaint plausibly rose to the level of severe or pervasive harassment necessary to sustain a claim of retaliatory harassment. One month after filing her MCAD complaint, Rae attended a disciplinary hearing when Nelson learned that a student obtained a t-shirt

containing an alcohol reference from Rae's office, but she was not subject to any formal reprimand. And six months after filing her MCAD complaint, Nelson "created a false emergency" and subjected Rae to another disciplinary hearing when she left the building to use her inhaler. While we accept Rae's allegations that these events were personally humiliating and she subjectively experienced emotional distress, Rae has not pointed to any case law suggesting that these two incidents alone plausibly constituted objectively severe or pervasive harassment.[9]

At the motion to dismiss phase in particular, "[s]ubject to some policing at the outer bounds," the issue of whether

---

[9] We have affirmed dismissal at the summary judgment phase where the harassment was more severe or pervasive than the misconduct that Rae alleges here. See, e.g., Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34, 37-43, 46-47 (1st Cir. 2003) (holding that the incidents alleged were not severe or pervasive enough to constitute a hostile work environment where the plaintiff's manager warned the plaintiff not to bring any "problems" to the manager's boss, repeatedly made inappropriate remarks about the plaintiff's appearance, accused the plaintiff of having a negative attitude and threatened to reassign her to a new sales territory, and imposed requirements on the plaintiff for taking sick leave from work that went against company policy); Alvarado v. Donahoe, 687 F.3d 453, 462 (1st Cir. 2012) (holding on summary judgment that the plaintiff failed to establish a hostile work environment claim because the employer's actions did not constitute "severe or pervasive adverse conduct" where supervisors repeatedly made "taunting and mocking comments [that] were both callous and objectionable" about the plaintiff's psychiatric condition); Ponte v. Steelcase Inc., 741 F.3d 310, 314, 320-21 (1st Cir. 2014) (affirming entry of summary judgment against the plaintiff's hostile work environment claims that involved her supervisor's "unwelcome arm around her shoulder as he insisted on driving her alone back to her hotel after work" on two occasions and insinuating that the plaintiff "owed" him for hiring her).

harassment was severe or pervasive "is commonly one of degree -- both as to severity and pervasiveness -- to be resolved by the trier of fact." Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 474 (1st Cir. 2002); see also Noviello, 398 F.3d at 94 (explaining that "no pat formula exists for determining with certainty whether the sum of harassing workplace incidents rises to the level of an actionable hostile work environment," and "[s]uch a determination requires the trier of fact to assess the matter on a case-by-case basis, weighing the totality of the circumstances"); cf. Billings v. Town of Grafton, 515 F.3d 39, 49 (1st Cir. 2008) (explaining that, even at summary judgment, cases providing "instructive examples of actionable sexual harassment, . . . do not suggest that harassing conduct of a different kind or lesser degree will necessarily fall short of that standard").

But the Supreme Court has made clear that "a wholly conclusory statement of claim" cannot "survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." Twombly, 550 U.S. at 561 (alteration in original) (citation omitted). Moreover, "[t]o clear the plausibility hurdle, a complaint must contain 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' sufficient to flesh out a viable claim." Butler v. Balolia, 736

F.3d 609, 617–18 (1st Cir. 2013) (second alteration in original) (quoting Twombly, 550 U.S. at 556).

Taking Rae's allegations of these two incidents as true, and even assuming that discovery would yield sufficient evidence to prove those allegations, what Rae lacks here is a "viable claim." In the context of severe or pervasive harassment, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'" to support a retaliatory harassment claim. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Furthermore, Rae has not sufficiently alleged how the t-shirt and inhaler incidents affected her work performance. See Ayala-Sepúlveda v. Mun. of San Germán, 671 F.3d 24, 31 (1st Cir. 2012) (upholding grant of summary judgment against the plaintiff on a hostile work environment claim where "there is no evidence on the record that [the plaintiff's] work performance suffered as a result of his anxiety" stemming from his employer's adverse actions); Bhatti, 659 F.3d at 74 (affirming grant of summary judgment against the plaintiff on a hostile work environment claim in part because she "pointed to no effect whatsoever on her work performance").

And while Rae contends that her complaint alleges "a litany of harassing conduct over a long period of time," for reasons discussed above, only two timely incidents of retaliatory harassment stemming from filing her MCAD complaint remain. Rae

has not pointed us to any case law -- nor have we independently identified any substantive support -- suggesting that these two incidents alone can plausibly satisfy the severe or pervasive harassment standard.   Therefore, Rae's timely retaliatory harassment claims must be dismissed on this ground.

### III. Conclusion

For the foregoing reasons, the district court's decision dismissing Rae's complaint is **affirmed**.